JONATHAN MAY ET AL. *v.* WILLIAM COFFEY ET AL.
(SC 17936)

Rogers, C. J., and Norcott, Katz, Zarella and Schaller, Js.

Argued September 18, 2008—officially released April 14, 2009

*David R. Schaefer*, with whom were *Sean M. Fisher* and, on the brief, *Brian P. Daniels*, for the appellants (plaintiffs).

*Aaron S. Bayer*, with whom were *Howard O. Godnick*, pro hac vice, and *Robert G. Huelin*, and, on the brief, *Gregory A. Kasper*, pro hac vice, and *John F. Conway*, for the appellees (defendants).

*Opinion*

SCHALLER, J. The plaintiffs, Jonathan May and Carolyn May,[1] appeal[2] from the judgment of the trial court dismissing their complaint against the defendants, who collectively own a majority of the shares of stock in

---

[1] We refer to Jonathan May and Carolyn May collectively as the plaintiffs, but when appropriate, we refer individually to Jonathan May as May.

[2] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

Latex Foam International Holdings, Inc. (company).[3] The plaintiffs, who own a minority share of the company, claim that the trial court improperly concluded that they lacked standing to bring their causes of action because their complaint alleged an injury to the company rather than to the plaintiffs as individual shareholders. We affirm the judgment of the trial court.

Because we review the trial court's decision to grant a motion to dismiss, we "take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader." (Internal quotation marks omitted.) *DaimlerChrysler Corp.* v. *Law,* 284 Conn. 701, 711, 937 A.2d 675 (2007). "[A] motion to dismiss admits all facts well pleaded and invokes any record that accompanies the motion, including supporting affidavits that contain undisputed facts. . . . If a resolution of a disputed fact is necessary to determine the existence of standing when raised by a motion to

[3] The defendants are: William Coffey, chairman of the board of directors of the company; Robert Jenkins, a member of the company's board of directors; Stephen Russo, the company's president and chief executive officer and a member of its board of directors; William Basset, a member of the company's board of directors; Val Stalowir, a member of the company's board of directors; John Pouschine, a member of the company's board of directors; Pouschine Cook Capital Partners, LP; Mary Coffey; Nancy Coffey; Richard Merrill, the company's controller, individually and in his capacity as trustee of the John M. Coffey Family Grantor Trust, John M. Coffey Family Spray Trust, Richard J. Coffey Family Grantor Trust, Richard J. Coffey Family Spray Trust, Maureen A. Coffey Family Grantor Trust and Maureen A. Coffey Family Spray Trust; Maureen Coffey, individually and in her capacity as custodian for Caroline A. Coffey under the Connecticut Uniform Transfers to Minors Act (act), General Statutes § 45a-557 et seq.; John Coffey, the company's executive vice president and chief information officer and a member of its board of directors, individually and in his capacity as custodian for Brendan H. Coffey and Michael J. Coffey under the act; and Richard Coffey, a member of the company's board of directors, individually and in his capacity as custodian for Kathleen E. Coffey and Patricia M. Coffey under the act. We refer to the named parties collectively as the defendants, and individually by name when appropriate.

dismiss, a hearing may be held in which evidence is taken." (Citation omitted.) *Golodner* v. *Women's Center of Southeastern Connecticut, Inc.*, 281 Conn. 819, 826, 917 A.2d 959 (2007).

After the trial court held an evidentiary hearing on January 23, 2007, it issued a memorandum of decision detailing the following undisputed facts. The company is a closely held Connecticut corporation that manufactures latex foam products. From January 1, 1993, until his employment was terminated in January, 2001, May worked for the company as its executive vice president and chief operating officer. Prior to his termination, the company loaned May money to purchase shares of the company's stock.[4]

On June 4, 1999, the defendant Pouschine Cook Capital Partners, LP (Pouschine Cook) purchased 48,000 shares of the company's stock in exchange for $5 million and a senior subordinated note in the amount of $3.5 million. The note was due in June, 2005.

On May 14, 2001, a fire damaged the company's manufacturing plant and corporate offices. Subsequently, the company's board of directors decided to build a new facility with proceeds from an insurance policy on the company's assets. The new facility was opened on May

---

[4] Pursuant to the terms of the loan agreement, the company had the right to demand repayment of the borrowed money upon May's separation from the company. If he failed to repay the loan timely upon demand, the company could retire the debt by repossessing his shares of the company's stock.

When the company terminated May's employment in 2001, it refused to pay severance and benefits due under his employment contract. May and the company submitted their dispute to binding arbitration, and a panel of arbitrators ordered payment of severance and benefits due. In the midst of that dispute, the company exercised its rights to repossess May's shares of its stock. An appraiser valued the stock at $26.50 per share for purposes of the repossession. Accordingly, the company repossessed 34,951 shares of stock collectively held by the plaintiffs, leaving them with 3849 shares at the time of the stock offering that spawned the present litigation.

14, 2002. That same year, the company paid the balance due on the $3.5 million note to Pouschine Cook.

In October, 2002, the company's board of directors determined that the company needed to raise capital in order to continue its operations. On December 13, 2002, the company's shareholders approved an increase in the company's outstanding shares. To that end, the company undertook a multiphase stock offering to raise $3.5 million, the same amount that the company had repaid to Pouschine Cook earlier in 2002, through the sale of 424,242 new shares of stock. Under the initial phase, existing shareholders were offered 1.970844 shares of stock for each share they currently held.[5] During the second phase, shareholders who had purchased shares during the initial phase were given the opportunity to purchase any remaining shares. The defendants represented that the offering price of $8.25 per share was based upon a valuation performed in September, 2002. For purposes of the motion to dismiss only, the parties stipulated that the offering price of $8.25 was unreasonably low.

The stock purchases under this two phase offering resulted in a change in the proportion of ownership among the shareholders. The most notable result was that Pouschine Cook became the majority shareholder, and other defendants; see footnote 3 of this opinion; lost their majority status. The plaintiffs chose not to participate in the offering, which, for purposes of the motion to dismiss only, the parties stipulated was not

[5] Although the trial court's memorandum of decision provides that "existing shareholders were offered one share of stock for each share they currently held," this finding is not supported anywhere in the record. Instead the record unequivocally demonstrates, and the parties agree, that existing shareholders were offered 1.970844 shares each, which represents the ratio of new shares available for purchase in the stock offering to shares outstanding prior to the offering. Thus, if every shareholder had participated fully in the initial phase of the offering, there would have been no shares available for sale during the second phase.

unreasonable. As a result, their percentage ownership of the outstanding stock was reduced from 1.79 percent to 0.6 percent.

The plaintiffs initiated the present action in a two count complaint against the defendants. The plaintiffs allege that the defendants, acting in concert as a shareholder majority, set the offering price of the shares too low, resulting in the dilution of the plaintiffs' percentage ownership of the company. They claim that, as a result of the unreasonably low offering price, the defendants breached their fiduciary duty to the plaintiffs and have been unjustly enriched by their actions at the expense of the plaintiffs.

The defendants filed a motion to dismiss both counts of the complaint. In their motion to dismiss, the defendants claimed, inter alia, that the plaintiffs lack standing to bring this action in their individual capacity as shareholders because their complaint alleges an injury caused to the company, which, the defendants argue, requires the plaintiffs to assert the rights of the company in a shareholder derivative suit. Following a hearing, the court agreed with the defendants and granted the motion to dismiss for lack of subject matter jurisdiction because the plaintiffs had not asserted a shareholder derivative cause of action. This appeal followed.

On appeal, the plaintiffs challenge the trial court's conclusion that they lacked individual standing to bring their claims against the defendants. Specifically, the plaintiffs claim that the majority shareholders sustained no injury as a result of the unreasonably low offering price because of their participation in the stock offering. They argue that, by participating in the offering, the majority shareholders benefited from the unreasonably low offering price at the sole expense of the minority shareholders, including the plaintiffs. Therefore, the plaintiffs argue, the company was not injured because

the harm did not diffuse proportionately among all of its shareholders. In the alternative, the plaintiffs claim that because the company is a closely held corporation, they may assert a direct cause of action notwithstanding the fact that the company suffered an injury from the unreasonably priced stock offering. We reject both of the plaintiffs' claims and address each in turn.

Before addressing the plaintiffs' claims, we set forth our standard of review. "Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . When standing is put in issue, the question is whether the person whose standing is challenged is a proper party to request an adjudication of the issue . . . . Standing requires no more than a colorable claim of injury; a [party] ordinarily establishes . . . standing by allegations of injury. Similarly, standing exists to attempt to vindicate arguably protected interests. . . .

"Standing is established by showing that the party claiming it is authorized by statute to bring suit or is classically aggrieved. . . . The fundamental test for determining aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in [the subject matter of the challenged action], as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the [challenged action]. . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected."

(Internal quotation marks omitted.) *Smith* v. *Snyder*, 267 Conn. 456, 460–61, 839 A.2d 589 (2004).

"The issue of standing implicates subject matter jurisdiction and is therefore a basis for granting a motion to dismiss. Practice Book § 10-31 (a). [I]t is the burden of the party who seeks the exercise of jurisdiction in his favor . . . clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute. . . . Because a determination regarding the trial court's subject matter jurisdiction raises a question of law, our review is plenary."[6] (Internal quotation marks omitted.) *McWeeny* v. *Hartford*, 287 Conn. 56, 63–64, 946 A.2d 862 (2008).

I

The plaintiffs first claim that the unreasonably priced stock offering injured them directly and resulted in no harm to the majority shareholders or to the company as a whole. They claim, therefore, that they have individual standing to bring directly their breach of fiduciary duty and unjust enrichment claims against the defendants. We disagree.

To determine whether the plaintiffs have standing as individuals to sustain their claims against the defendants, we begin with a brief overview of the nature of a shareholder derivative action. "A shareholder's deriv-

[6] Both parties, as well as the trial court, relied heavily on the laws of other states, particularly Delaware, in analyzing the plaintiffs' claims. Because the company is incorporated in the state of Connecticut, we apply the laws of this state to resolve the plaintiffs' claim. Annot., 93 A.L.R.2d 1354 (1964) (standing to maintain stockholder's derivative action determinable by law of state of incorporation); see also *Messinger* v. *United Canso Oil & Gas Ltd.*, 486 F. Sup. 788, 789 n.1 (D. Conn. 1980) (applying laws of Canada to derivative action brought in Connecticut by shareholders of Canadian corporation); *Steinberg* v. *Hardy*, 90 F. Sup. 167, 169 (D. Conn. 1950), citing *Union & New Haven Trust Co.* v. *Watrous*, 109 Conn. 268, 276, 146 A. 727 (1929) (applying law of state of incorporation, New York, for purposes of establishing date dividend declared).

ative suit is an equitable action by the corporation as the real party in interest with a stockholder as a nominal plaintiff representing the corporation. . . . It is designed to facilitate holding wrongdoing directors and majority shareholders to account and also to enforce corporate claims against third persons. If the duties of care and loyalty which directors owe to their corporations could be enforced only in suits by the corporation, many wrongs done by directors would never be remedied." (Citations omitted; internal quotation marks omitted.) *Barrett* v. *Southern Connecticut Gas Co.*, 172 Conn. 362, 370, 374 A.2d 1051 (1977).

In *Yanow* v. *Teal Industries, Inc.*, 178 Conn. 262, 281–82, 422 A.2d 311 (1979), we stated that "[a] distinction must be made between the right of a shareholder to bring suit in an individual capacity as the sole party injured, and his right to sue derivatively on behalf of the corporation alleged to be injured. . . . Generally, individual stockholders cannot sue the officers at law for damages on the theory that they are entitled to damages because mismanagement has rendered their stock of less value, since the injury is generally not to the shareholder individually, but to the corporation— to the shareholders collectively. . . . In this regard, it is axiomatic that a claim of injury, the basis of which is a wrong to the corporation, must be brought in a derivative suit, with the plaintiff proceeding secondarily, deriving his rights from the corporation which is alleged to have been wronged. . . . It is, however, well settled that if the injury is one to the plaintiff as a stockholder, and to him individually, and not to the corporation, as where an alleged fraud perpetrated by the corporation has affected the plaintiff directly, the cause of action is personal and individual. . . . In such a case, the plaintiff-shareholder sustains a loss separate and distinct from that of the corporation, or from that of other shareholders, and thus has the right to seek

redress in a personal capacity for a wrong done to him individually." (Citations omitted; internal quotation marks omitted.) Thus, "where an injury sustained to a shareholder's stock is peculiar to him alone, and does not fall alike upon other stockholders, the shareholder has an individual cause of action." Id., 282 n.9.

Subsequently, in *Smith* v. *Snyder*, supra, 267 Conn. 461, we reaffirmed the general rule that "[i]n order for a shareholder to bring a direct or personal action against the corporation or other shareholders, that shareholder must show an injury that is separate and distinct from that suffered by any other shareholder or by the corporation. . . . [A] shareholder—even the sole shareholder—does not have standing to assert claims alleging wrongs to the corporation." (Citation omitted; internal quotation marks omitted.)

As these cases make clear, the central inquiry in our resolution of the plaintiffs' claim is whether the stock offering to existing shareholders at a price that was unreasonably low resulted in a separate and distinct harm to the plaintiffs, or whether the unreasonably low price harmed the corporation and, accordingly, all shareholders collectively. The overwhelming weight of authority supports the conclusion that, ordinarily, a stock offering at below market value does not result in a separate and distinct harm to individual shareholders. See, e.g., *Frankel* v. *Slotkin*, 984 F.2d 1328, 1334 (2d Cir. 1993) (as seller of its own securities, corporation suffers independent injury when it issues its securities for less than fair value); *Schuster* v. *Gardner*, 127 Cal. App. 4th 305, 316, 25 Cal. Rptr. 3d 468 (2005) (harm caused to corporation when defendants, inter alia, caused it to issue newly authorized shares "in payment for an ill-conceived acquisition spree," and harm to shareholders, dilution in stock value, was incidental thereto [internal quotation marks omitted]); *In re J.P. Morgan Chase & Co. Shareholder Litigation*, 906 A.2d

808, 818 (Del. Ch. 2005) (corporation directly injured and shareholders injured derivatively when board of directors authorizes issuance of stock for no or grossly inadequate consideration), aff'd, 906 A.2d 766 (Del. 2006); *Southwest Health & Wellness, LLC* v. *Work*, 282 Ga. App. 619, 625–26, 639 S.E.2d 570 (2006) (when interests of all shareholders diminished in proportion to their ownership by selling of interests to new shareholders, no separate and distinct injury to shareholders); see also *Public Investment Ltd.* v. *Bandeirante Corp.*, 740 F.2d 1222, 1232 (D.C. Cir. 1984) ("[s]elling shares for promissory notes doomed to default" harms corporation by diluting equity of shareholders); *Strasenburgh* v. *Straubmuller*, 146 N.J. 527, 554–55, 683 A.2d 818 (1996) (actions that have effect of depressing stock value harm all shareholders and therefore give rise to derivative claims). Existing shareholders suffer an indirect injury, a reduction in the value of their existing shares, which is derived from the unreasonably low offering price of the new shares.[7] See, e.g., *Frankel* v.

---

[7] We disagree with the conclusion of the United States Court of Appeals for the Second Circuit in *Strougo* v. *Bassini*, 282 F.3d 162, 171 (2d Cir. 2002) (applying Maryland's "distinct injury" test), which the plaintiffs cite in their brief. In *Strougo*, the Court of Appeals for the Second Circuit stated, without citation, that a share of stock is not an asset to its issuing corporation and concluded, on that basis, that a corporation is not injured by an undervalued stock offering because "the acts that allegedly harmed the shareholders *increased* the [corporation's] assets." (Emphasis in original.) Id., 175. We find the view expressed by the United States District Court in *In re Nuveen Fund Litigation*, 855 F. Sup. 950 (N.D. Ill. 1994), which the Court of Appeals for the Second Circuit rejected in *Strougo*, to be more persuasive. See *Strougo* v. *Bassini*, supra, 171 n.6. In *In re Nuveen Fund Litigation*, supra, 955, the United States District Court for the Northern District of Illinois concluded that, for purposes of identifying an injury to a corporation, it is irrelevant that a decrease in the value of each of the corporation's outstanding shares coincided with an increase in the total assets of the corporation. This principle properly reflects the more widely accepted view that treasury stock, outstanding shares of a corporation that it reacquires after those shares previously had been issued, is corporate property, i.e., a corporate asset. See 18B Am. Jur. 2d, Corporations § 1778 (2004).

*Slotkin,* supra, 1334; *In re J.P. Morgan Chase & Co. Shareholder Litigation,* supra, 818.

The plaintiffs concede in their brief that, if the company had held a public stock offering at the same unreasonably low price, but a disinterested third party purchased every new share, the company would suffer the harm because it would have received inadequate consideration for the new shares. The plaintiffs attempt to distinguish the present case, however, by arguing that the dilution of the value of existing shares, which resulted from the unreasonably low offering price, was borne by nonparticipating shareholders alone, while participating shareholders increased the value of their shares as a result of the improper pricing. We are unpersuaded. The plaintiffs cite to *Katzowitz* v. *Sidler,* 24 N.Y.2d 512, 519, 249 N.E.2d 359, 301 N.Y.S.2d 470 (1969), for the proposition that, in this situation, "[w]hen new shares are issued . . . at prices far below fair value in a close corporation or a corporation with only a limited market for its shares, existing stockholders, who do not want to invest or do not have the capacity to invest additional funds, can have their equity interest in the corporation diluted to the vanishing point." As a result, the plaintiffs claim, the participating shareholders benefited to the sole detriment of the nonparticipants.

The plaintiffs have focused on the wrong inquiry. The issue in this case is not whether the existing shareholders were able to offset the injury to their existing shares by participating in the offering, but whether the company, i.e., all existing shareholders, suffered an injury as a result of the unreasonably low offering price of the new shares. It is undisputed that the unreasonably low offering price equally diluted the value of all existing shares. Participating shareholders and nonparticipating shareholders, therefore, were harmed equally

by the offering.[8] The mere fact that the participating shareholders were able and willing to offset the injury to their existing shares partially or completely by purchasing new shares at the unreasonably low price did not lessen the dilution of their existing shares. The plaintiffs' argument improperly distracts our attention from the injuries that flow to the corporation from the defendants' allegedly wrongful conduct by focusing on the benefits to certain shareholders that accrued therefrom.

Moreover, the plaintiffs do not argue, and nothing in our case law suggests, that an individual cause of action is required when a derivative action would have the indirect effect of redressing an injury to those shareholders whose self-dealing caused the harm to the corporation. See *Fink* v. *Golenbock*, 238 Conn. 183, 206–207, 680 A.2d 1243 (1996), citing *Larson* v. *Dumke*, 900 F.2d 1363, 1367 (9th Cir. 1990) (concluding single minority shareholder to be adequate representative in derivative suit against all other shareholders who had benefited from wrong claimed in suit); see also *Manson* v. *Stacescu*, 11 F.3d 1127, 1131–32 (2d Cir. 1993) (even though shareholder allegedly had participated in wrongdoing, she sustained same injury with respect to value of her shares as plaintiff and both would be made whole by derivative action), cert. denied, 513 U.S 915, 115 S. Ct. 292, 130 L. Ed. 2d 206 (1994); *Sax* v. *World Wide*

---

[8] The plaintiffs' reliance on *Acker* v. *Transurgical, Inc.*, Delaware Court of Chancery, Docket No. 201-N, 2004 Del. Ch. LEXIS 49 (April 22, 2004), for a contrary conclusion is misplaced. In *Acker*, the court acknowledged that the issuance of a new series of stock to majority shareholders for less than fair value may be considered an injury to the corporation. Id., *5. A separate injury to individual shareholders, however, arose from the subsequent conversion of their shares for less than fair value. Id. Thus, in addition to the fact that it decided *Acker* on the basis of Delaware law, and not Connecticut law, the court described two separate transactions, one resulting in harm to the corporation and one resulting in harm to individual shareholders. In the present case, by contrast, the alleged harm flowed from a single transaction, the issuance of new shares of stock for less than fair value.

*Press, Inc.*, 809 F.2d 610, 614 (9th Cir. 1987) ("[e]ven if the [majority shareholders] depleted [the corporation's] assets with the sole purpose of decreasing the value of [the minority shareholder's] stock and destroying his return on his investment, the action would nonetheless be derivative"); *Strasenburgh* v. *Straubmuller*, supra, 146 N.J. 554–55 (concluding that shareholders' claim was derivative in spite of allegations of self-dealing by other shareholders who held management positions). Even if we accept as true, as we must for purposes of the defendants' motion to dismiss; see *Andross* v. *West Hartford*, 285 Conn. 309, 340, 939 A.2d 1146 (2008); the plaintiffs' allegation that the defendants conspired to dilute the plaintiffs' shares, a proper remedy to the company in this case, either in the form of an additional contribution by the participating shareholders or by a cancellation of some of the shares purchased by the participating shareholders, would make whole all shareholders, including: those who, like the plaintiffs, did not participate in the offering; those who were coerced to buy additional shares or risk losing value in their existing shares; and those who conspired to dilute the plaintiffs' shares. If the plaintiffs were to receive relief through an individual action, however, shareholders who committed no wrongdoing would continue to bear the cost to the company of the low offering price.[9]

Because the unreasonably low offering price injured the corporation and because a proper remedy to the corporation would make all shareholders whole, we conclude that the injury suffered by the plaintiffs, the dilution of their existing shares by the unreasonably low pricing of the new shares, was derivative of the

---

[9] The plaintiffs' position would encourage, rather than discourage, multiple lawsuits, as it would permit shareholders who are similarly situated to bring an action against the defendants directly for the dilution of their preexisting shares. Such repetitive litigation is exactly what a derivative claim is designed to prevent. See 19 Am. Jur. 2d, Corporations § 1945 (2004).

harm suffered by the company. Accordingly, we reject the plaintiffs' claim that they have individual standing because the unreasonably low offering price injured them directly.

## II

The plaintiffs claim in the alternative that, notwithstanding the fact that the unreasonably low offering price injured the company, they nonetheless may raise a direct claim against the defendants because the company is a closely held corporation. In support of their claim, the plaintiffs cite a footnote in our decision in *Fink* v. *Golenbock*, supra, 238 Conn. 200 n.14, for the proposition that "in the case of a closely held corporation, the court may choose to treat a derivative action as a direct action . . . ." We are not persuaded that the facts of this case allow for the court to exercise such discretion.

In *Fink*, we concluded that a shareholder of one half of a closely held corporation could initiate a derivative action against the holder of the other half who used corporate assets to establish a new business, lost corporate funds in speculative investments and falsely informed corporate clients that the corporation no longer existed. Id., 201–202. In reaching our conclusion, we rejected the defendant's argument that, in the case of a closely held corporation in which the plaintiff and the defendant were the only shareholders, any injury caused by the defendant necessarily was an injury to the plaintiff individually, and not an injury to the corporation. Id., 202. We further stated, however, that "there may be some instances in which the facts of a case give rise either to a direct action or to a derivative action—such as when an act affects both the relationship of the particular shareholder to the corporation and the structure of the corporation itself, causing or threatening injury to the corporation. 2 American Law

Institute, [Principles of Corporate Governance: Analysis and Recommendations (1994)] § 7.01, comment (c); see also J. Welch, 'Shareholder Individual and Derivative Actions: Underlying Rationales and the Closely Held Corporation,' 7 J. Corp. L. 147, 156 (1984) ('[T]he injury criterion can be most misleading in cases involving closely held corporations. If followed literally, this criterion would convert almost all actions by the shareholders of closely held corporations into individual actions, since the impact of almost any injury to such corporations will fall heavily upon its shareholders.')." *Fink* v. *Golenbock,* supra, 238 Conn. 202–203.

The plaintiffs claim that the facts of this case give rise to the type of dual standing contemplated in *Fink.* They argue, on the basis of Delaware law, that this case embodies "a species of corporate overpayment claim . . . [that is] both derivative and direct in character." *Gentile* v. *Rossette,* 906 A.2d 91, 99 (Del. 2006). According to the plaintiffs, when the company received less than fair value for its new shares of stock, they incurred a separate harm: "an extraction from the [minority] shareholders, and a redistribution to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest. . . . In such circumstances, the [minority] shareholders are entitled to recover the value represented by that [undervaluation of stock]—an entitlement that may be claimed by the [minority] shareholders directly and without regard to any claim the corporation may have." Id., 100.

It is Connecticut law, not Delaware law, that controls our resolution of this case. See footnote 6 of this opinion. As we explained in part I of this opinion, under Connecticut law, harm of the type suffered by the minority shareholders in *Gentile* is not separate and distinct from the harm suffered by the corporation. Consistent with that discussion, we fail to see how the

company's receipt of less than fair value for its new shares of stock becomes a separate and distinct harm to individual shareholders merely because a controlling shareholder, rather than an independent third party, acquires the offsetting benefits. This distinction is not what we contemplated in *Fink*, wherein we envisioned an act that "affects both the relationship of the particular shareholder to the corporation and the structure of the corporation itself, causing or threatening an injury to the corporation." *Fink* v. *Golenbock*, supra, 238 Conn. 202. The present action reflects the reverse situation, that is, an injury to the corporation, which affects the relationship of the shareholders to the corporation and the structure of the corporation itself. As such, it cannot be remedied through a direct action by individual shareholders.

For all of the foregoing reasons, we conclude that the plaintiffs in this case were required to bring their claims in a derivative action on behalf of the company. Because they sought individual relief, the court properly determined that the plaintiffs lacked standing and properly granted the defendants' motion to dismiss the plaintiffs' complaint for lack of subject matter jurisdiction.

The judgment is affirmed.

In this opinion the other justices concurred.