# JARJURA FOR COMPTROLLER ET AL. *v.*
# STATE ELECTIONS ENFORCEMENT
# COMMISSION ET AL.

Superior Court, Judicial District of Hartford
File No. CV-10-5034997

Memorandum filed July 30, 2010

*Carmody & Torrance*, for the plaintiffs.

*Maura Murphy Osborne* and *Robert W. Clark*, assistant attorneys general, and *Richard Blumenthal*, attorney general, for the defendants.

*Koskoff Koskoff & Bieder, P.C.*, and *Daniel E. Livingston*, for the defendant Lembo 2010.

GRAHAM, J.

I

FACTS

This case arises from the 2010 Democratic primary contest for Connecticut state comptroller between Kevin Lembo, the convention endorsed candidate, and Michael J. Jarjura, the mayor of Waterbury. The primary election is scheduled for August 10, 2010. More specifically, this case arises from the approval by the defendant statewide elections enforcement commission (SEEC) of public financing for Lembo's campaign.

Jarjura's candidate committee is a plaintiff in this action, along with Jarjura, and is entitled Jarjura for Comptroller. Lembo created his candidate committee for the office of comptroller, Lembo 2010, on May 20 of this year. It is a defendant in this action, along with

the SEEC; Albert P. Lenge, executive director and general counsel of the SEEC; Denise L. Nappier, state treasurer; and Nancy S. Wyman, the current comptroller (state defendants).

Both candidates have elected to participate in the candidate public financing program enacted by Connecticut in 2005, known officially as the Citizens' Election Program (CEP), General Statutes § 9-700 et seq. A candidate for comptroller in a primary qualifies for a grant of $375,000 in public campaign funds if the candidate raises $75,000 in "qualifying contributions" of $100 or less, at least $67,500 of which is from state residents.

On July 11, 2010, Lembo 2010 filed a mandated quarterly filing with the SEEC for the period from the opening of the candidate committee to July 1, 2010, on SEEC form 30. On that form, Lembo 2010 reported that it had raised $24,064. On July 13, 2010, Lembo filed an SEEC form 10, stating his intent to abide by the requirements of the CEP and became a participating candidate in the CEP.

On July 15, 2010, Lembo 2010 filed a second SEEC form 30, reporting that it had raised $51,239 from July 1 to 14, 2010. The aggregate of the funds raised and reported in the Lembo 2010 filings of July 11 and 15, 2010, was $75,303. These filings did not include reports of moneys raised by an exploratory committee established by Lembo, which were contained in an earlier filing by that exploratory committee. On July 15, 2010, Andrew Cascudo, the SEEC elections officer assigned to the comptroller race, told Lembo 2010 that $11,490 raised by the exploratory committee met the definition of "qualifying contributions." Under General Statutes § 9-704 (a) (2) (B), such contributions would be counted toward the $75,000 threshold, with limited exception.

On July 16, 2010, Lembo 2010 filed an SEEC form 15 certification and application for a CEP grant of $375,000

for Lembo's candidacy for comptroller. On that same day, the SEEC received a complaint from Robert Brown, campaign manager of Jarjura for Comptroller, regarding the Lembo 2010 application for a CEP grant. Brown claimed that the exploratory committee contributions could not be credited toward the $75,000 threshold because of certain events that occurred in November, 2009, and April, 2010.

On July 16, 2010, the SEEC instructed Lembo 2010 that it could substitute contributions raised between July 15 and 21, 2010, for contributions submitted in the Lembo 2010 filing of July 15, 2010. This instruction was consistent with the SEEC's policy and practice since it began operating the CEP in 2008. In 2008 and 2010, participating candidates were permitted to supplement applications for CEP grants with information and substitute contributions after the applications were filed with the SEEC. With the exception of candidates who filed applications containing fraudulent information, the SEEC has consistently permitted candidates who have submitted a written certification (SEEC form 15) in good faith to cure deficiencies identified by the SEEC before the SEEC is required to make a decision on the candidate's application. More than 100 candidates have taken advantage of this opportunity since 2008.

On July 18, 2010, the SEEC provided Lembo 2010 with a candidate services unit report, a document routinely provided to candidates by the SEEC and commonly referred to as a candidate report card. The SEEC determined that of the $75,303 in contributions contained in the Lembo 2010 filings on July 11 and 15, 2010, $2963 could not yet be qualified by the SEEC as "qualifying contributions." The SEEC determined that of that $2963, $1813 could be qualified as "qualifying contributions" with an amendment to disclosures such as replacing address information that contained only a post office box with a street address or providing other

backup documentation. Of the remaining $1150, the SEEC determined that $465 could not be cured. As to the remaining $685, the SEEC did not make a determination whether the contribution could be cured with supplemental information.

On Monday, July 19, 2010, Lembo 2010 submitted another SEEC form 30, stating that between July 15 and 18, 2010, it had raised $6480.10 in contributions. Of that $6480.10, the SEEC accepted $5805.10 as "qualifying contributions." The SEEC did not accept $675 as "qualifying contributions."

Lembo 2010 opted not to cure the deficiencies in its July 15, 2010 filing because it was informed that, with the July 19 filing, it had met the $75,000 threshold. The aggregate of contributions contained in Lembo 2010's SEEC form 30 filings on July 11, 15 and 19 was $81,783.10. The aggregate of the contributions that were not accepted by the SEEC as "qualifying contributions" from Lembo 2010's July filings was $3638.

That $81,783.10 does not include moneys raised by the exploratory committee created by Lembo. The SEEC did not rule on Brown's complaint because it determined that the exploratory committee's $11,490 of "qualifying contributions" were not necessary to Lembo 2010 meeting the $75,000 threshold. No ruling has been made to this day.

On July 21, 2010, the SEEC found that Lembo 2010 had raised $78,155[1] in "qualifying contributions" and met the other criteria for a CEP grant for the primary for the office of comptroller and approved a grant in the amount of $375,000 for Lembo 2010. Jarjura for Comptroller had previously been approved for its grant in the amount of $375,000.

---

[1] There is approximately a $10 discrepancy in the reported numbers, which is of no consequence to this case.

By July 23, 2010, the state had electronically transferred the grant to Lembo 2010. On that day, the plaintiffs filed this action, and a chambers conference was held with counsel for all parties present. The essence of the verified complaint is that the SEEC improperly approved Lembo 2010 for the CEP, despite Lembo 2010 not meeting the $75,000 threshold by the application deadline of July 16. The plaintiffs claim to be adversely affected by that decision. They ask for an injunction preventing the state defendants from transferring the grant to Lembo 2010, which is moot because the grant proceeds are already in the possession of Lembo 2010. They also ask for an injunction preventing Lembo 2010 from spending the grant proceeds. Lembo 2010 agreed to spend no more than $30,000 of the $375,000 prior to 1 p.m. on Tuesday, July 27, 2010.[2] A hearing was scheduled for Monday, July 26, 2010, at 2 p.m. on the plaintiffs' temporary injunction request. Prior to that hearing, the parties exchanged offers of proof and briefs, pursuant to court order.

Lembo 2010 also filed a motion to dismiss-motion to strike, challenging the plaintiffs' standing and cause of action. Without objection, the motion to dismiss was combined with the hearing on the motion for a temporary injunction. The motion to dismiss is denied for reasons set forth in the discussion of standing in this memorandum.[3]

The hearing on July 26 recessed at 6 p.m. and continued the next morning. It ended after 1:15 p.m. on July 27. At the hearing, the court received twelve exhibits, ranging in length from 130 pages to one page. Each party presented witnesses, those being Jarjura, Richard Baltimore (deputy campaign manager of Gerry Garcia

---

[2] All counsel later agreed to extend this time to 5 p.m. on July 27, 2010.

[3] The court will not take up the motion to strike portion of that pleading at this time, as it is premature.

for secretary of the state), Beth Rotman (director of the CEP), Jacqueline Kozin (campaign manager of Lembo 2010) and Jonathan Pelto (communications adviser to Lembo 2010). The court heard closing argument and entered an order denying the temporary injunction before 5 p.m. for reasons set forth in this memorandum of decision.

## II

## ANALYSIS

## A

## Standing

The motion to dismiss, raising a claim of lack of standing on the part of the plaintiffs, must be addressed first. In its motion to dismiss, Lembo 2010 argues that the plaintiffs lack standing to bring this action because the CEP creates no cause of action for challenging an opponent's receipt of a grant. "The issue of standing implicates subject matter jurisdiction . . . ." (Internal quotation marks omitted.) *May* v. *Coffey*, 291 Conn. 106, 113, 967 A.2d 495 (2009). "[T]he plaintiff bears the burden of proving subject matter jurisdiction, whenever and however raised." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC* v. *New London*, 265 Conn. 423, 430 n.12, 829 A.2d 801 (2003). "The subject matter jurisdiction requirement may not be waived by any party, and also may be raised by a party, or by the court sua sponte, at any stage of the proceedings . . . ." *Peters* v. *Dept. of Social Services*, 273 Conn. 434, 441, 870 A.2d 448 (2005). "It is well established that, in determining whether a court has subject matter jurisdiction, every presumption favoring jurisdiction should be indulged." (Internal quotation marks omitted.) *Massey* v. *Branford*, 119 Conn. App. 453, 458, 988 A.2d 370, cert. denied, 295 Conn. 921, 991 A.2d 565 (2010).

"Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless [one] has, in an individual or representative capacity, some real interest in the cause of action . . . . Standing is established by showing that the party claiming it is authorized by statute to bring suit or is classically aggrieved." (Internal quotation marks omitted.) *Gold* v. *Rowland*, 296 Conn. 186, 207, 994 A.2d 106 (2010).

"Standing is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented." (Internal quotation marks omitted.) *Missionary Society of Connecticut* v. *Board of Pardons & Paroles*, 278 Conn. 197, 201–202, 896 A.2d 809 (2006). "These two objectives are ordinarily held to have been met when a complainant makes a colorable claim of direct injury he has suffered or is likely to suffer, in an individual or representative capacity. Such a personal stake in the outcome of the controversy . . . provides the requisite assurance of concrete adverseness and diligent advocacy. . . . The requirement of directness between the injuries claimed by the plaintiff and the conduct of the defendant also is expressed, in our standing jurisprudence, by the focus on whether the plaintiff is the proper party to assert the claim at issue." (Internal quotation marks omitted.) *Burton* v. *Commissioner of Environmental Protection*, 291 Conn. 789, 802–803, 970 A.2d 640 (2009).

The plaintiffs must satisfy the court that they are the proper parties to bring suit. The plaintiffs claim standing to bring this action under General Statutes § 9-324. That provision, which allows an action to be brought directly

to the Superior Court, provides in relevant part: "[A]ny candidate for the office of . . . State Comptroller, who claims that such candidate is aggrieved by a violation of any provision of sections 9-700 to 9-716, inclusive, may bring such . . . candidate's complaint to any judge of the Superior Court, in which such . . . candidate shall set out . . . the claimed violations of said sections. . . ." General Statutes § 9-324. In other words, the plaintiffs contend that they satisfy the requirements of the statute because Jarjura is a candidate for the office of state comptroller who claims that he has been injured by a violation of the statutes governing campaign finance.[4]

Lembo 2010 argues that even if § 9-324 permits the plaintiffs to bring a cause of action against the state defendants, it does not provide a cause of action against a private actor. The court looks to well established principles of statutory interpretation in determining this issue. General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." Furthermore, "we presume that there is a purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous." (Internal quotation marks omitted.) *AvalonBay Communities, Inc.* v. *Zoning Commission*, 280 Conn. 405, 422, 908 A.2d 1033 (2006).

---

[4] The standing of Jarjura for Comptroller rises and falls with Jarjura's standing. See *State* v. *Nardini*, 187 Conn. 109, 112–13, 445 A.2d 304 (1982) ("no person is entitled to set the machinery of the courts in operation except to obtain redress for an injury he has suffered or to prevent an injury he may suffer, either in an individual or representative capacity" [internal quotation marks omitted]).

Section 9-324 provides a means for judicial review of alleged violations of the CEP for any candidate who claims that such candidate is aggrieved by any violation of any provision of General Statutes §§ 9-700 to 9-716. Thus, a plaintiff has standing under § 9-324 if he is a candidate for state comptroller who claims that he is aggrieved by a violation of an enumerated provision of the CEP. The statute does not expressly limit the persons against whom the action may be brought. Nowhere does § 9-324 limit the cause of action an aggrieved candidate may bring for violations of §§ 9-700 to 9-716 to claims against the SEEC or another state actor. Rather, the statute broadly states, in clear and unambiguous terms, that a violation of an enumerated portion of the CEP provides a candidate aggrieved by such violation a cause of action in this court.

However, in order to establish standing to bring suit against any defendant, the plaintiffs must still establish that they are "aggrieved" within the meaning of § 9-324. "[I]n cases of statutory aggrievement, particular legislation grants standing to those who claim injury to an interest protected by that legislation." (Internal quotation marks omitted.) *Andross* v. *West Hartford*, 285 Conn. 309, 322, 939 A.2d 1146 (2008). "Whether the plaintiffs are statutorily aggrieved under [any given statute] is a question of statutory interpretation . . . ." *Stauton* v. *Planning & Zoning Commission*, 271 Conn. 152, 158, 856 A.2d 400 (2004). "[T]he existence of statutory standing . . . depends on whether the interest sought to be protected by the [plaintiffs] is arguably within the zone of interests to be protected or regulated by the statute . . . ." (Internal quotation marks omitted.) *Gillon* v. *Bysiewicz*, 105 Conn. App. 654, 660, 939 A.2d 605 (2008).

A determination that the plaintiffs have standing to bring these claims of improper candidate financing is supported by the interest sought to be protected by the

statutory scheme at issue. The CEP was created to counter actual and perceived corruption in the state's political processes. See *Green Party of Connecticut* v. *Garfield*, United States Court of Appeals, Docket Nos. 09-3760-cv(L), 09-3941-cv(CON), 2010 U.S. App. LEXIS 14286, *6 (2d Cir. July 13, 2010) ("several contemporaneous statements from General Assembly members, as well as Governor [M. Jodi] Rell, explain that the [Campaign Finance Reform Act (CFRA), General Statutes § 9-700 et seq.] was passed 'to combat actual and perceived corruption in state government' "). In order to effectuate this purpose (among others), the legislature created the CEP. It is implicit that candidates for elected office, as well as the state actors administering election programs, must follow the statutory provisions that the legislature provided for in the CEP in order to preserve public confidence in the integrity of the election process.

Moreover, the legislature, in enacting such measures, did not intend to eliminate competition in the market for political candidates. As the parties to the present matter conceded at oral argument, money matters in political campaigns. Indeed, that is a fundamental premise of the CEP. Under the unique factual circumstances of this case, in which candidates for the office of state comptroller are engaged in a two person primary race, if there is a provision of public campaign funds in violation of §§ 9-700 to 9-716, there is an adverse and injurious effect on the integrity of the election process and on an opposing candidate who abided by those same statutory mandates. The plaintiffs' action against the defendants is authorized by § 9-324 and seeks to protect the interests furthered by §§ 9-700 to 9-716.

The plaintiffs also meet both prongs of the classical aggrievement test. Whether a party has established classical aggrievement is examined on a case-by-case basis, "[requiring] an analysis of the particular facts of the

case in order to ascertain whether a party has been aggrieved . . . ." (Internal quotation marks omitted.) *Goldfisher* v. *Connecticut Siting Council*, 95 Conn. App. 193, 197, 895 A.2d 286 (2006). "The fundamental test for determining [classical] aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all the members of the community as a whole. Second, the party claiming aggrievement must successfully establish that the specific personal and legal interest has been specially and injuriously affected by the decision. . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Internal quotation marks omitted.) *Gold* v. *Rowland*, supra, 296 Conn. 207.

The plaintiffs satisfy the first prong of the classical aggrievement test in that they have demonstrated a specific personal and legal interest in the SEEC's decision to grant Lembo 2010 a funding grant. The plaintiffs are not mere members of the larger community of voting citizens. Jarjura is one of only two candidates for the Democratic nomination for comptroller. The plaintiffs have a particular interest in whether public funds are allocated to the other candidate for state comptroller because money is essential to the election process, and the plaintiffs' electoral fortunes are the mirror image of Lembo 2010's. Without the CEP grant, Lembo 2010 lacks the financial means to run an effective campaign. The plaintiffs have a specific interest in seeing that the administrative procedures governing the grant of public funds to comptroller candidates are properly administered because it directly impacts their future.

The plaintiffs also satisfy the second prong of the classical aggrievement analysis. The plaintiffs claim that a determination by the SEEC to grant public funds to the sole competitor in the primary for state comptroller will impact the primary election. That is, the decision to grant public funds to Lembo 2010, allegedly in violation of the CEP's statutory application procedures, has directly impacted the plaintiffs' campaign. The plaintiffs who were previously granted CEP funding and agreed to the CEP spending limits, now must wage a campaign against an equally funded competitor, with attendant changes to their strategy and chances, because of the allegedly illegal CEP grant to Lembo 2010. Judge Aurigemma, in ruling on the recent challenge by one Republican gubernatorial candidate to CEP primary funding of another Republican gubernatorial candidate, found that "[t]he plaintiffs would be irreparably harmed if the defendants used public funds to campaign against them if the defendants were not legally entitled to those funds." *Foley* v. *State Elections Enforcement Commission,* Superior Court, judicial district of Hartford, Docket No. CV-10-5034960 (July 13, 2010) (*Aurigemma, J.*), aff'd, 297 Conn. 764, 2 A.3d 823 (2010).

Section 9-324 was designed to provide judicial review for a candidate for statewide office who has a claim of aggrievement based on a violation of the CEP. The plaintiffs' complaint is authorized by § 9-324, seeks to protect an interest protected by §§ 9-700 to 9-716 and has met the two-pronged criteria for classical aggrievement. Accordingly, the plaintiffs have standing to bring this action against all defendants, and the motion to dismiss is denied.

## B

### Temporary Injunction

The plaintiffs seek a temporary injunction that will prevent Lembo 2010 from using the $375,000 CEP grant.

The issuance of a temporary injunction is an "extraordinary remedy" that "courts [should grant] cautiously." *Hartford* v. *American Arbitration Assn.*, 174 Conn. 472, 476, 391 A.2d 137 (1978). "The remedy by injunction is summary, peculiar and extraordinary. An injunction ought not to be issued except for the prevention of great and irreparable mischief." (Internal quotation marks omitted.) *Connecticut Assn. of Clinical Laboratories* v. *Connecticut Blue Cross, Inc.*, 31 Conn. Sup. 110, 113, 324 A.2d 288 (1973). To succeed on their motion for a temporary injunction, the plaintiffs must demonstrate four things: (1) they have no adequate remedy at law; (2) they will suffer irreparable and imminent harm without an injunction; (3) they are likely to prevail on the merits of their claim; and (4) a balancing of the equities favors the granting of the temporary injunction. See *Waterbury Teachers Assn.* v. *Freedom of Information Commission*, 230 Conn. 441, 446, 645 A.2d 978 (1994).

The plaintiffs have failed to demonstrate either a likelihood of success on the merits at trial or that a balancing of the equities favors granting the temporary injunction. It is for those reasons that the application for a temporary injunction is denied.

1

Likelihood of Success on the Merits

The likelihood of the plaintiffs' success turns on the interpretation of the statutes governing the CEP and, specifically, whether the SEEC can allow a candidate to add contributions received between the filing of its grant application and SEEC's decision upon same.

"Over the past decade, Connecticut has been rocked by several widely publicized corruption scandals involving high-ranking state and local officials, including, inter alia, the resignation and conviction of Governor John Rowland for improperly accepting valuable gifts and

services in exchange for lucrative state contracts. As a result of those scandals, in an effort to restore citizens' faith in state government, the General Assembly passed the CFRA in late 2005. The CFRA is comprised of two principal components: (1) the CEP . . . which creates a voluntary scheme for the public financing of campaigns for statewide and state legislative office, and (2) a ban on campaign contributions from, and solicited by, certain lobbyists, state contractors, and their immediate family members." *Green Party of Connecticut* v. *Garfield*, 648 F. Sup. 2d 298, 306–307 (D. Conn. 2009), rev'd in part, United States Court of Appeals, Docket Nos. 09-3760-cv(L), 09-3941-cv(CON), 2010 U.S. App. LEXIS 14286 (2d Cir. July 13, 2010).

The CEP was created to counter such actual and perceived corruption in the state's political processes. See *Green Party of Connecticut* v. *Garfield*, supra, 2010 U.S. App. LEXIS 14286, *6. It is a remedial statute and, as such, the CEP must be liberally construed. See *Commission on Human Rights & Opportunities* v. *Sullivan*, 285 Conn. 208, 222, 939 A.2d 541 (2008). Nor should a court construe the act in a manner that will thwart its intended purpose. See *Kelly* v. *New Haven*, 275 Conn. 580, 616, 881 A.2d 978 (2005).

Further, the SEEC is the agency entrusted with implementing and enforcing the CEP. "Although the interpretation of statutes is ultimately a question of law . . . it is the well established practice of this court to accord great deference to the construction given [a] statute by the agency charged with its enforcement." (Internal quotation marks omitted.) *Okeke* v. *Commissioner of Public Health*, 122 Conn. App. 373, 378, 999 A.2d 808 (2010).

The CEP is complex[5] and necessarily requires agency interpretation in its application, especially during the

---

[5] The 2010 guide for participating candidates is 130 pages.

frenetic pace of a campaign season. The court should accord significant deference to the SEEC's interpretation of the relevant statutory provisions, especially in the context of an application for a temporary injunction. See *Foley* v. *State Elections Enforcement Commission*, supra, Superior Court, Docket No. CV-10-5034960.

"The principles that govern statutory construction are well established. When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes." (Internal quotation marks omitted.) *State* v. *Rodriguez-Roman*, 297 Conn. 66, 74–75, 3 A.3d 783 (2010).

The original legislation establishing the CEP, Public Acts, Spec. Sess., October, 2005, No. 05-5, § 3, did not contain the statutory language at issue in this case. General Statutes § 9-706 (g) (1), enacted in 2008, provides in relevant part: "Any application submitted pursuant to this section for a primary or general election shall be submitted in accordance with the following schedule: (A) By five o'clock p.m. on the third Thursday in May of the year that the primary or election will be held at which such participating candidate will seek nomination or election, or (B) by five o'clock p.m. on any subsequent Thursday of such year, provided no application shall be accepted by the commission after five o'clock p.m. on or after the fourth to last Friday prior to the primary or election at which such participating candidate will seek nomination or election. Not later than four business days following any such Thursday or Friday, as applicable . . . the commission shall

review any application received by such Thursday or Friday, in accordance with the provisions of subsection (d) of this section, and determine whether such application shall be approved or disapproved. For any such application that is approved, any disbursement of funds shall be made not later than twelve business days prior to any such primary or general election. . . .ʺ

Section 9-706 (g) (1) sets forth three separate deadlines: a deadline by which a candidate must submit an application; a second deadline by which the SEEC must finally approve or disapprove that application; and a third deadline by which the SEEC must disburse any grants that have been approved.

Nothing in the language of § 9-706 (g) prohibits a candidate from supplementing or curing deficiencies in an application before the SEEC is statutorily required to act on it. Nor does § 9-706 (g) (or any other provision of the General Statutes) include a deadline by which a candidate must stop raising qualifying contributions.[6]

Nor does § 9-706 (d) (2), which sets forth the manner in which the SEEC must review requests for public grants, prohibit candidates from supplementing their initial applications with additional information, including qualifying contributions received by a candidate after filing an application with the SEEC.[7]

As the plaintiffs note, § 9-706 (b) requires that the candidate provide a "written certification that . . . [his or her] (1) . . . candidate committee has received the required amount of qualifying contributions . . . .ʺ

---

[6] Nor do the statutes provide a start date for raising contributions.

[7] General Statutes § 9-706 (d) (2) provides in relevant part that "[i]n accordance with the provisions of subsection (g) of this section, the commission shall review the application, determine whether . . . (2) in the case of an application for a grant from the fund for a primary campaign, the applicant has met the applicable condition under subsection (a) of this section for applying for such grant and complied with the provisions of subsections (b) and (c) of this section . . . ."

General Statutes § 9-706 (b). But nothing in the language of that section expressly prohibits a candidate from raising additional qualifying contributions to remedy any deficiencies in his or her application discovered before the SEEC formally acts on it.[8]

The SEEC's interpretation that it can consider contributions submitted between the application and decision deadlines is supported by the absence of negative words in the relevant statutes stating that "qualifying contributions" received after the application deadline shall not be considered or allowed by the SEEC.

To the extent that the statutory scheme is unclear as to allowing the submission of postapplication contributions, the legislative history of the CEP supports allowing such. Number 08-2 of the 2008 Public Acts (P.A. 08-2), which created the schedule contained in § 9-706 (g), was intended to establish a workable framework for the SEEC to meet and consider grant applications, and establish a deadline by which the SEEC must disburse any CEP grants. Neither of those goals are served by prohibiting the SEEC from exercising its discretion to permit candidates to supplement or cure a timely application submitted by a candidate.

Prior to P.A. 08-2 there was no deadline for grant applications. The only limitation that existed in the original CEP was contained in § 9-706 (d), which gave the SEEC three business days to review and act on an application. The practical result was that candidates could apply for grants throughout the entire election cycle, up to and including the eve of an election.

It was the SEEC that requested the amendment of 2008, to create a more practical and coherent framework for action on applications and the distribution

---

[8] It is commonplace for some contributions to be disallowed by the SEEC in determining whether a campaign committee has met the "qualifying contribution" threshold required to qualify for CEP funding.

of funds. In remarks on the 2008 bill in the General Assembly, the focus was on the SEEC disbursement of funds in a timely way before a general election or primary, rather than on the process between the application submission and agency decision: "[W]hat the amendment, part of the amendment does is to control at least when a candidate who qualifies for the Citizens Election Fund can receive their money. Without that amendment, we had situations that were possible and some that even took place, where people were receiving tens of thousands of dollars with little time to spend the money in an appropriate and responsible way." 51 H.R. Proc., Pt. 3, 2008 Sess., p. 917, remarks of Representative Lawrence F. Cafero, Jr. The amendment "strengthens the bill by adjusting the cut-off date to provide assurance that you will have knowledge that you are a publicly funded candidate in primaries and general elections. The application deadline is now [twenty-five] calendar days before election, and special elections, [fourteen] calendar days." Id., p. 912, remarks of Representative Diana S. Urban.

According to its proponents, P.A. 08-2 was intended to implement changes that were primarily procedural and did not reflect "[any] shifts in policy from the original bill." Id., p. 909, remarks of Representative Urban. The primary impact of the change was to impose deadlines by which applications must be submitted, by which the SEEC could approve or disapprove any grant request and by which the SEEC could disburse any grant that has been approved before the election.

Given that the primary harm P.A. 08-2 was intended to remedy was the receipt of CEP grants immediately before an election, the deadline for the disbursement of grant funds is what drives the other deadlines contained in § 9-706 (g). Nothing in the language creating

the schedule for considering grant requests or its legislative history supports the plaintiffs' claim that the deadline for application was meant to preclude candidates from curing application defects prior to the time the SEEC formally acts on a grant request.

In sum, there is no language in the statutory scheme prohibiting the SEEC's consistent practice of considering postapplication contributions, nor is that practice in conflict with the legislative goals and history of the CEP. For that reason, the plaintiffs are unlikely to succeed at trial.

2

Balancing of the Equities

The court must also balance the equities of granting or denying the requested injunction. The equities favor denying the injunction. The plaintiffs will suffer harm from Lembo 2010's spending the CEP grant, as set forth earlier in this opinion. But Lembo 2010 will suffer greater and unjustified harm if it is enjoined from spending the grant. Further, the public interest would then be harmed.

Throughout the grant application process, Lembo 2010 followed and relied on the advice of staff from the SEEC, the state agency charged with administering the CEP, without having reason to doubt that advice. It was the SEEC that advised Lembo 2010 that $11,490 of the exploratory committee contributions qualified toward the threshold of the CEP grant for the comptroller primary. This occurred just one day before the application deadline. It was the SEEC, which, when the plaintiffs' campaign manager contested such use of Lembo's exploratory funds by filing a complaint on the application deadline date, suggested to Lembo 2010 that it raise additional qualifying contributions after the application date. It was the SEEC, which, when some

Lembo 2010 contributions initially included with the application were not qualified, advised Lembo 2010 that it could supplement information as to such contributions after the application date to qualify them or raise additional funds after the application date to replace them. It was the SEEC that advised Lembo 2010 that the additional, postapplication "qualified contributions" placed Lembo 2010 over the $75,000 threshold and that there was no need for the SEEC to resolve the complaint about the applicability of the exploratory funds to the grant application.[9] And it was because of that advice that Lembo 2010 did not submit compiled information to qualify those contributions initially rejected by the SEEC.

If this court were to issue the requested injunction against Lembo 2010, it would be Lembo 2010, not the SEEC, that would have to pay a steep price for following the SEEC's advice. Lembo 2010 would be unable to spend its CEP grant. This would leave Lembo 2010 with, at most, less than $50,000 on hand to finance the last two weeks of the statewide primary campaign against the plaintiffs. The plaintiffs received the $375,000 grant and have already mailed three statewide direct mail pieces. Lembo 2010 has yet to utilize direct mail or traditional media and cannot do so without the grant. Because Lembo 2010 has applied and been accepted under the CEP, it could not raise any additional funds. Even if Lembo 2010 were released from the CEP program, Lembo would spend the time remaining until the election "dialing for dollars" instead of campaigning, with no certainty as to the fundraising results. As Pelto succinctly stated of the Lembo campaign: "Without the grant money, there will be no campaign."

---

[9] Lembo 2010 has still not received a disposition of that complaint from the SEEC, which disposition could render moot the issue of contributions raised after the application deadline.

The harm to Jarjura, in having to campaign on an equal financial basis with his opponent if the injunction is denied, is significantly less than the harm to Lembo, whose campaign will effectively be eliminated if the injunction is granted.[10]

The public interest should also be considered in weighing the equities of granting or denying the requested injunction. The legislative record from the adoption of the CEP clearly demonstrates that the legislature was, among other goals, concerned with maintaining a level playing field among the candidates. See 48 H.R. Proc., Pt. 37, October, 2005 Spec. Sess., p. 11,360, remarks of Representative Shawn T. Johnston ("But if we're going to have public financing, and I do believe in public financing of campaigns, the whole theory is to even the playing field. If you've evened the playing field, then you don't need the incumbent, the challenger to raise those large sums of money."); id., p. 11,379, remarks of Representative Patricia M. Widlitz ("However, I think to say this is self-serving is totally inaccurate. I think it's just the opposite. We're offering our opponents who have a more difficult time in raising funds for their campaigns the same opportunity that we have, to level the playing field."); id., p. 11,395, remarks of Representative Reginald G. Beamon ("[w]e want to equal the playing field").

Granting an injunction to prohibit Lembo from spending his CEP moneys would tilt the playing field, a playing field that is, without the injunction, financially level. Denying the injunction would preserve the level playing field.

There is also the question of the injury to the public if one candidate is prevented from communicating

---

[10] While the plaintiffs claim that Lembo would still be on the ballot in the general election, on the Working Families Party Line, the evidence does not support that claim.

effectively with voters due to a lack of financial resources.

"Even assuming that the plaintiffs have demonstrated irreparable injury, moreover, they are not entitled to a temporary restraining order because the public interest weighs strongly against it. . . . It is also injurious to the public interest insofar as it deprives voters of the opportunity to hear the viewpoints of a gubernatorial candidate who reasonably opted into the CEP trusting that he would be able to receive and expend funds in accordance with its rules. Issuing a temporary restraining order will render voters in the Republican primary less informed about the gubernatorial candidates seeking the Party's nomination because it will limit the speech of one candidate . . . ." (Citations omitted.) *Foley* v. *State Elections Enforcement Commission*, United States District Court, Docket No. 3:10cv1091 (SRU), 2010 U.S. Dist. LEXIS 71744, *18–*20 (D. Conn. July 16, 2010).

What is true of the Republican gubernatorial primary, in which there are three candidates and the CEP funded defendant had already received $1.25 million, is at least equally true of the Democratic comptroller primary, in which there are two candidates and an injunction would limit one to a total of $75,000. The voters would be deprived of a meaningful opportunity to hear the views of one of the two Democratic candidates for comptroller if an injunction were to issue.

For all of the reasons set forth, the plaintiffs' application for a temporary injunction is denied.