ONE COUNTRY, LLC, ET AL. *v.* MICHAEL
JOHNSON ET AL.
(AC 32960)

Gruendel, Alvord and Schaller, Js.

Argued April 19—officially released September 4, 2012

*John B. Farley*, with whom were *Lawrence P. Weisman* and, on the brief, *Joseph J. Arcata III* and *Eric D. Bernheim*, for the appellant (plaintiff Scott Porter).

*David Eric Ross*, for the appellee (named defendant).

*Michael J. Barnaby*, for the appellee (defendant Peter Pratley).

*Opinion*

ALVORD, J. In this action to enforce written guarantee agreements, the plaintiff Scott Porter[1] appeals from the judgment, rendered after a court trial, in favor of

---

[1] Although One Country, LLC, originally was a plaintiff in this case, it withdrew its claims before trial and is not a party to the present appeal. We therefore refer in this opinion to Scott Porter as the plaintiff.

the defendants Michael Johnson and Peter Pratley.[2] On appeal, the plaintiff claims that the trial court improperly determined that the guarantees were not enforceable against the defendants because the plaintiff failed to demonstrate that he had suffered a loss. We agree with the plaintiff and, accordingly, reverse the judgment of the trial court.

The following facts were found by the court or are not disputed. In late 2004, the plaintiff and his then wife, Jennifer Porter,[3] resided at 3 Country Road in Westport. At that time, the owners of 1 Country Road were planning to sell their property. The Porters believed that they could make a significant profit if they purchased the adjoining property, enlarged and restored the house, and then sold the property. Because they had no experience in the restoration of properties or investment in real estate, Jennifer Porter approached Johnson, an acquaintance, who was involved in the restoration of another residential property located on Beachside Avenue in Westport. Johnson introduced the Porters to Pratley, who owned The Pratley Company, LLC, an investor and the general contractor for the Beachside Avenue project.

The Porters, Johnson and Pratley formed a limited liability company, One Country, LLC, in furtherance of their plans to purchase and to redevelop the 1 Country Road property. Pursuant to the company's operating agreement, the Porters invested $200,000 through their jointly owned limited liability company, Iboport, LLC.

---

[2] This action was brought against Johnson, Pratley, Jennifer G. Porter and The Pratley Company, LLC. The plaintiff withdrew his complaint as to Jennifer G. Porter and The Pratley Company, LLC, at trial, thereby leaving Johnson and Pratley as the only remaining defendants. We refer in this opinion to Johnson and Pratley as the defendants and individually by name where appropriate.

[3] Hereinafter, we refer to the plaintiff and Jennifer Porter collectively as the Porters where appropriate.

Johnson and Pratley each invested $50,000. All of the parties understood that mortgage financing and additional equity investments of at least $200,000 were required in order to purchase the property and to complete the renovations.

Connecticut Community Bank, N.A., doing business as The Greenwich Bank & Trust Company (bank), agreed to provide the financing for the project. Although the bank considered the financing to be one transaction, there were two separate notes and mortgages executed by One Country, LLC, in connection with the acquisition and construction loans. The commercial note for the acquisition of the property, in the amount of $1,080,000, was signed on March 7, 2005. The note was secured by a commercial mortgage on the property. As additional security, the plaintiff, as the sole guarantor, unconditionally guaranteed the payment of the acquisition loan by One Country, LLC. Because Johnson and Pratley already had signed guarantees to the bank in connection with the Beachside Avenue project, the bank was unwilling to rely on their guarantees of the acquisition and construction loans to One Country, LLC.

By the end of 2005, the Porters' personal relationship had deteriorated and divorce proceedings had commenced. The note for the $1,000,000 construction loan to One Country, LLC, was signed on February 9, 2006. Sometime after the execution of the acquisition loan documents, but before the construction loan closing, the plaintiff forwarded what he termed "backstop" guarantee agreements to Jennifer Porter, Johnson and Pratley.[4] The plaintiff, an attorney employed as corporate in-house counsel, drafted the guarantees. He indicated that he would not sign the personal guarantee for the

[4] The plaintiff testified that, prior to the March 7, 2005 acquisition loan closing, he told the defendants that he demanded backstop guarantee agreements. The defendants claimed that the issue was not discussed until the fall of 2005.

construction loan to One Country, LLC, unless Jennifer Porter, Johnson and Pratley signed guarantees that provided protection to him in the event he was required to honor either of his personal guarantees to the bank. The three backstop guarantees were signed before the plaintiff signed his second personal guarantee to the bank at the construction loan closing.

Despite the bank financing and an additional $200,000 in contributions raised through the admittance of four new members to the company, One Country, LLC, exhausted all of its capital in 2007, and was unable to complete the renovations to the property. In 2008, after One Country, LLC, ceased making payments to the bank, the bank commenced foreclosure proceedings against the company and the plaintiff, as guarantor. The court rendered a judgment of strict foreclosure, and the bank then sought a deficiency judgment against the plaintiff. The bank and the plaintiff resolved the matter by entering into a settlement agreement, in which the bank agreed to withdraw its motion for a deficiency judgment upon the plaintiff's payment of $300,000. The plaintiff paid $300,000 to the bank and commenced the present action against the defendants to enforce the backstop guarantees.

A court trial was held on several days in July, 2010. More than forty exhibits were submitted as evidence, including copies of the plaintiff's personal guarantees to the bank, the backstop guarantees signed by the defendants and the settlement agreement between the plaintiff and the bank. One of the plaintiff's witnesses, Steven Glaser, was a certified public accountant who had prepared tax returns for the plaintiff, Iboport, LLC, and One Country, LLC, for 2008 and 2009. He testified that the plaintiff made the $300,000 settlement payment to the bank, and then he indicated how that payment was treated for tax purposes. Basically, the plaintiff's payment to the bank was characterized as an additional

capital contribution to Iboport, LLC, the jointly owned limited liability company through which he acquired his interest in One Country, LLC. The plaintiff consequently claimed his 50 percent share of a pass-through loss on his personal tax return. Glaser testified that the tax benefit would have to be adjusted if the plaintiff were to be reimbursed by the other members of One Country, LLC, for the loan deficiency.[5]

The parties filed posttrial briefs with the court. In its memorandum of decision issued September 23, 2010, the court discussed the respective positions of the parties. The court then determined that "the intent of the [backstop] guarantees is clear—if the plaintiff was obligated to make payments to the [b]ank under his personal guarantee and One Country, LLC, thereby became indebted to the plaintiff, the defendants would be obligated to make payment to the plaintiff to discharge One Country, LLC's debt to the plaintiff." Furthermore, despite the defendants' arguments to the contrary, the court found that the plaintiff's execution of his personal guarantee to the bank in connection with the construction loan was sufficient consideration to support each of the defendants' backstop guarantees. Nevertheless, the court determined that the plaintiff's tax treatment of his $300,000 settlement payment to the bank precluded his recovery under the backstop guarantees: "The plaintiff's election to contribute the obligations owed to him by One Country, LLC, to Iboport, LLC, and that entity's subsequent decision to convert that debt to equity precludes the court from finding that either

---

[5] In Glaser's memorandum explaining the methodology used in preparation of the relevant tax returns, which was admitted as an exhibit at trial, he stated: "Please note that if any of the other [m]embers of One Country, LLC that are sub-guarantors on the loan reimburse Iboport (SP) for their respective share of the loan deficiency the amount will have to be reported by Iboport (SP) as income or the payment made by the sub-guarantor will have to be reduced by the tax benefit Iboport (SP) received in 2008."

the plaintiff or Iboport, LLC, suffered a loss." Accordingly, the court rendered judgment in favor of the defendants. This appeal followed.

The plaintiff's claim on appeal is that because the backstop guarantees signed by the defendants were absolute and unconditional and waived all defenses, the court improperly declined to enforce those guarantees on the ground that the plaintiff characterized his loss to the bank as an increase in his capital contribution to Iboport, LLC, for accounting purposes. We agree.

We begin with the applicable standard of review. "To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *73-75 Main Avenue, LLC* v. *PP Door Enterprise, Inc.*, 120 Conn. App. 150, 164, 991 A.2d 650 (2010).

"A guarantee, similar to a suretyship, is a contract, in which a party, sometimes referred to as a secondary obligor, contracts to fulfill an obligation upon the default of the principal obligor." (Internal quotation marks omitted.) Id., 165. We therefore look to the express terms of the backstop guarantee agreements between the plaintiff and the defendants to interpret the contractual provisions. Each defendant in his respective guarantee agreement is identified as the guarantor. The guarantee is "to and in favor of Scott Porter," who is also referred to as "SDP." The stated consideration is to induce the plaintiff to execute a personal guarantee to the bank in connection with loans (underlying transactions) to One Country, LLC, which is identified as the debtor. The relevant provisions of the guarantee agreements are as follows.

Paragraph one of the guarantee agreements provides: "GUARANTOR, as primary obligor and not merely as surety, hereby absolutely, unconditionally and irrevocably guarantees to SDP the complete and punctual (i) payment in full when due, whether at scheduled payment, prepayment, stated maturity, acceleration, demand or otherwise, of any and all present and future obligations of DEBTOR to SDP arising from the Underlying Transactions, whether of principal, interest, overdue interest, fees, expenses, indemnities and other amounts and (ii) performance by DEBTOR of all other obligations and covenants under the Underlying Transactions (collectively, the 'Guaranteed Obligations'). This Guaranty is a continuing guaranty of payment and performance and not only of collection and shall be valid and enforceable until all Guaranteed Obligations and all other obligations have been indefeasibly paid in full and completely performed."

Paragraph 3 of the guarantee agreements provides in relevant part: "GUARANTOR HEREBY EXPRESSLY WAIVES: (i) any defense arising by reason of the incapacity, lack of authority or any disability of DEBTOR or the invalidity or unenforceability of any of the Underlying Transactions [or] Guaranteed Obligations . . . in whole or in part; (ii) notice of any Underlying Transactions or of the performance thereunder; (iii) notice of acceptance of this Guaranty by SDP; (iv) presentment, demand, notice of dishonor or default, protest of every kind, notice of protest, notice of non-payment or other default with respect to the Guaranteed Obligations and all other notices whatsoever; (v) diligence on the part of SDP in the collection of the Guaranteed Obligations or any security with respect thereto; (vi) the occurrence of any other condition precedent to which GUARANTOR might otherwise be entitled; (vii) *to the fullest extent permitted by law, any defenses or benefits that may be derived from or afforded by law which limit*

*the liability of or exonerate guarantors, or which may conflict with the terms of this Guaranty;* (viii) the existence of any dispute with respect to any default by DEBTOR; (ix) notice of assignment of this Guaranty by SDP . . . ." (Emphasis added.)

Paragraph 4 of the guarantee agreements provides in relevant part: "Without notice to GUARANTOR and without in any way affecting the liability of GUARANTOR hereunder, SDP shall have the right, at any time and from time to time, to: (i) make, amend, supplement, or modify with DEBTOR any Underlying Transaction . . . and/or extend credit to DEBTOR with regard thereto; (ii) extend or otherwise alter the terms of payment or amount of the Guaranteed Obligations and grant such other indulgences to DEBTOR as SDP deems proper; (iii) surrender, release, modify or dispose of any other security SDP now has or may hereafter have with respect to the Guaranteed Obligations; (iv) request and accept other guaranties of the Guaranteed Obligations . . . . *The obligations of GUARANTOR shall not be discharged or otherwise affected by any settlement, waiver, release or variation as to any payment or other obligation due from DEBTOR to SDP* . . . ." (Emphasis added.)

Finally, paragraph 13 (e) of the guarantee agreements provides: "GUARANTOR acknowledges and agrees that this Guaranty shall not be construed in favor of GUARANTOR based upon the allegation that SDP drafted (or is deemed to have drafted) this Guaranty."

The express language in the defendants' backstop guarantee agreements is plain and broad, providing absolute and unconditional protection to the plaintiff in the event of a default by One Country, LLC, in the performance of its obligations to the bank in connection with the acquisition and construction loans for 1 Country Road in Westport. The defendants contractually

agreed to reimburse the plaintiff for any payments he made to the bank resulting from a default by One Country, LLC. When the plaintiff paid $300,000 to the bank in settlement of its deficiency claims against One Country, LLC, for which the plaintiff was liable under his personal guarantee to the bank, One Country, LLC, became indebted to the plaintiff and the defendants then became liable to the plaintiff under the terms of their backstop guarantee agreements.[6] Furthermore, the defendants contractually agreed to waive all defenses to the fullest extent permitted by law. "While a determination about a party's intent to waive his rights ordinarily poses a question of fact, clear and definitive contract language can establish waiver as a matter of law." *Connecticut National Bank* v. *Douglas*, 221 Conn. 530, 545, 606 A.2d 684 (1992).

Significantly, in this appeal, the defendants have not challenged the trial court's factual finding that there was sufficient consideration for the execution of the backstop guarantee agreements. Moreover, they have not taken issue with the breadth of the guarantees, and they have not argued that they signed the guarantees without understanding their contents. Instead, they argue that the plaintiff, as a result of the tax treatment of his $300,000 settlement payment to the bank, failed to prove that One Country, LLC, owed him a debt. They maintain that whatever rights the plaintiff may have had with respect to that payment were extinguished and belonged instead to Iboport, LLC.

We conclude that the plaintiff's tax treatment of the debt owed by One Country, LLC, to him is irrelevant

---

[6] The trial court likewise reached this determination in its memorandum of decision: "[T]he intent of the [backstop] guarantees is clear—if the plaintiff was obligated to make payments to the [b]ank under his personal guarantee and One Country, LLC, thereby became indebted to the plaintiff, the defendants would be obligated to make payment to the plaintiff to discharge One Country, LLC's debt to the plaintiff."

to the issue of whether the plaintiff is entitled to reimbursement from the defendants under the express terms of the backstop guarantee agreements. The defendants do not dispute that One Country, LLC, was indebted to the plaintiff at the time he made the $300,000 settlement payment to the bank, but, rather, they maintain that the debt somehow was extinguished by virtue of the plaintiff's tax treatment of that transaction. This reasoning is flawed for several reasons.

The backstop guarantee agreements are absolute and unconditional. The defendants waived all defenses to the fullest extent of the law. The guarantee agreements do not provide that the defendants' liability would be affected by the plaintiff's treatment of the debt for tax or accounting purposes. Simply put, the defendants are bound by the contractual provisions to which they agreed.

Further, as Glaser testified, if the plaintiff successfully recouped some of the payment he made to the bank, he and Iboport, LLC, would have to report that income and to make a tax adjustment for the tax benefit received in 2008.

Finally, under the circumstances of this case, the tax treatment of the plaintiff's payment is irrelevant to the fact that he suffered a loss when he paid $300,000 to the bank as a result of One Country, LLC's default and that the defendants expressly agreed to reimburse him under those stated circumstances. There is no Connecticut case law directly addressing the effect, if any, of tax benefits taken by an individual or entity seeking to enforce the underlying liability of guarantors who have executed written guarantee agreements.[7] The defendants have not provided any case law to support their

---

[7] There is case law in other jurisdictions, which, although not directly on point, contains language in line with our determination in the present case. See, e.g., *Bragman* v. *Commonwealth Land Title Ins. Co.*, 421 F. Sup. 99, 103 n.9 (E.D. Pa. 1976) ("We find plaintiff's income tax treatment of his payment irrelevant. What may be an expense for purposes of income tax

positions, and logic dictates that treatment for tax or accounting purposes should not release them as guarantors from liability when they signed the absolute and unconditional guarantees at issue in this case.

The judgment is reversed and the case is remanded with direction to render judgment for the plaintiff.

In this opinion GRUENDEL, J., concurred.

SCHALLER, J., dissenting. The majority reverses the judgment of the trial court and determines that the plaintiff Scott Porter should prevail despite the fact that he assigned his interest in the defendants' written guarantees to Iboport, LLC (Iboport). In doing so, the majority appears to adopt the plaintiff's argument that the capital contribution made to Iboport did not represent a legal transfer of interest in the guarantees and, consequently, may be ignored as mere "tax treatment." Because the plaintiff assigned his rights under the guarantees to Iboport as a capital contribution and, therefore, lacked standing to seek enforcement of them in the present action, I respectfully dissent and conclude that the trial court should have dismissed the case due to the absence of subject matter jurisdiction.

In addition to the facts recited in the majority opinion, the following undisputed facts, as found by the trial court, are relevant to the present appeal. On its 2008 tax return, Iboport reported a $300,000 capital contribution

may also be a loss within the meaning of an insurance contract, and unfortunately for defendant, we are interpreting an insurance contract."); *H.J. Baker & Bro., Inc.* v. *Orgonics, Inc.*, 554 A.2d 196, 203 (R.I. 1989) ("[b]ecause plaintiff was not precluded from taking the bad-debt deduction [on its 1984 tax return] and simultaneously continuing efforts to collect the debt, any evidence of the deduction was irrelevant and properly excluded"); *Wichita Federal Savings & Loan Assn.* v. *Black*, 245 Kan. 523, 537, 781 P.2d 707 (1989) ("[n]one of [the] cases [cited by the defendant] stand for the proposition that a suit for recovery of losses is barred by a prior claim of the losses on a tax return").

from the plaintiff. In turn, also on its 2008 tax return, One Country, LLC (One Country), reported a $300,000 capital contribution from Iboport. This transfer of assets occurred in order to allow the plaintiff to take a $300,000 business loss and to receive a corresponding tax deduction. In its memorandum of decision, the court determined that "[t]he obligation for which the defendants provided their backstop guarantees was the obligation of One Country . . . to the plaintiff that arose when the plaintiff was required to pay $300,000 to the bank pursuant to his guarantee. After that obligation arose, the plaintiff chose to contribute the obligation to Iboport . . . . In this process, the plaintiff first divested himself of the title to the obligation, so that Iboport . . . rather than the plaintiff became the party entitled and empowered to enforce the defendants' backstop guarantees."

In view of this determination by the trial court, I believe that this court must address the issue of standing. "The issue of standing implicates the trial court's subject matter jurisdiction and therefore presents a threshold issue for our determination." (Internal quotation marks omitted.) *D'Amato Investments, LLC* v. *Sutton,* 117 Conn. App. 418, 421, 978 A.2d 1135 (2009). "Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy." (Internal quotation marks omitted.) *Wilcox* v. *Webster Ins. Inc.,* 294 Conn. 206, 214, 982 A.2d 1053 (2009). "[T]he court has a duty to dismiss, even on its own initiative, any appeal that it lacks jurisdiction to hear. . . . Moreover, [t]he parties cannot confer subject matter jurisdiction on the court, either by waiver or by consent." (Citation omitted; internal quotation marks omitted.) *Webster*

*Bank* v. *Zak*, 259 Conn. 766, 774, 792 A.2d 66 (2002). "Our review of the question of . . . standing is plenary." (Internal quotation marks omitted.) *Ulster Savings Bank* v. *28 Brynwood Lane, Ltd.*, 134 Conn. App. 699, 705, 41 A.3d 1077 (2012).

"It is a well established principle of contract law that assignment of one's rights under a contract results in [s]uccession by an assignee to exclusive ownership of all or part of the assignor's rights respecting the subject matter of the assignment, and a corresponding extinguishment of those rights in the assignor . . . . It is [also] well settled that one who [is] neither a party to a contract or a contemplated beneficiary thereof cannot sue to enforce the promise of the contract . . . ." (Citation omitted; internal quotation marks omitted.) *Shenkman-Tyler* v. *Central Mutual Ins. Co.*, 126 Conn. App. 733, 742–43, 12 A.3d 613 (2011).

In order to determine whether the plaintiff has standing to enforce the guarantees, the court must first examine whether the plaintiff was permitted to assign his interest in the guarantees to a third party. "[A] guarantee is a promise to answer for the debt, default or miscarriage of another. . . . It is simply a species of contract." (Citations omitted.) *Regency Savings Bank* v. *Westmark Partners*, 59 Conn. App. 160, 164, 756 A.2d 299 (2000). "The question of the parties' intent is [o]rdinarily . . . a question of fact [subject to appellate review under the clearly erroneous standard]. . . . If however, the language of the contract is clear and unambiguous, the court's determination of what the parties intended in using such language is a conclusion of law. . . . In such a situation our scope of review is plenary, and is not limited by the clearly erroneous standard. . . . Thus, in the absence of a claim of ambiguity, the interpretation of [a] contract presents a question of law. . . . Well established principles guide our analysis in determining whether the language of a contract is

ambiguous. [A] contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. [A]ny ambiguity in a contract must emanate from the language used by the parties. . . . In contrast, [a] contract is unambiguous when its language is clear and conveys a definitive and precise intent. . . . The court will not torture the words to impart ambiguity. . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." (Internal quotation marks omitted.) *D'Amato Investments, LLC* v. *Sutton*, supra, 117 Conn. App. 423–24.

In *Hudson United Bank* v. *Endeavor Group*, 96 Conn. App. 447, 449–50, 901 A.2d 64 (2006), this court examined a case in which the plaintiff sought to enforce a continuing personal guarantee from the defendant which had been assigned to it through a merger with another bank. In that case, the guarantee explicitly provided that "[t]his guarant[ee] shall inure to the benefit of [the predecessor bank], its successors, legal representatives and assigns." (Internal quotation marks omitted.) Id., 453. On the basis of this language, this court concluded that "the guarantee clearly provides that its benefit would continue to any and all successors . . . ." Id.

Likewise, in *D'Amato Investments, LLC* v. *Sutton*, supra, 117 Conn. App. 420–21, this court examined a case in which the assignee of a landlord sought to enforce a personal guarantee in order to recover amounts allegedly due pursuant to a commercial lease. In that case, the guarantee provided that "[t]he undersigned guarantees to Landlord, *Landlord's successors and assigns*, the full performance and observance of all covenants, conditions and agreements . . . ." (Emphasis in original; internal quotation marks omitted.) Id., 422. In light of this language, this court rejected

the defendant's claim the assignee lacked standing to enforce his personal guarantee. Id., 423.

In the present case, each of the guarantees provides that they "shall inure to the benefit of [the plaintiff], his successors and assigns, and shall be binding on [the guarantor] and his heirs, successors and permitted assigns." This language is equivalent to the terms present in *Hudson United Bank* and *D'Amato Investments, LLC.* Accordingly, I conclude that the guarantees properly may be assigned.

Having concluded that the guarantees were capable of being assigned, I next discuss whether the plaintiff did, in fact, assign his rights to Iboport by treating the $300,000 as a capital contribution. The plaintiff argues that this constituted "mere tax treatment" and was not the result of any transfer of assets. I believe the plaintiff is mistaken. "Tax treatment" does not exist in isolation but, rather, constitutes a reporting of underlying transactions or events that have taken place previously, namely, in this case, a capital contribution and a corresponding assignment of the plaintiff's interests in the guarantees.

General Statutes § 34-150, which governs capital contributions made to limited liability companies, provides: "An interest in a limited liability company may be issued in exchange for property, services rendered or a promissory note or other obligation to contribute cash or to perform services." Thus, under Connecticut law, the existence of a capital contribution requires the member to transfer something of value to the company. If this court were to assume, as the plaintiff concedes, that he made a capital contribution in the present case, it must logically follow that the plaintiff transferred something of value to Iboport, namely, his right to be

paid under the personal guarantees.[1] Because the plaintiff assigned his interest in the guarantees to Iboport, I conclude that he lacks standing to seek enforcement of them in court. *See Shenkman-Tyler* v. *Central Mutual Ins. Co.*, supra, 126 Conn. App. 742–43.

Although I agree with the trial court's conclusion that the plaintiff's decision to transfer his rights under the guarantees to Iboport as a capital contribution must prevent him from recovering under those contracts in the present case, I believe that rendering judgment in favor of the defendants was improper because the court lacked subject matter jurisdiction to entertain the plaintiff's cause of action. I would, therefore, reverse the judgment of the trial court and remand the case with direction to render judgment dismissing the plaintiff's action. For the foregoing reasons, I respectfully dissent.

---

[1] The absence of a formal contract transferring the right to payment under the personal guarantees to Iboport is inapposite to this conclusion. In prior cases decided by this court, the assignment of the guarantee was valid, even though the guarantee was not explicitly assigned. In *Hudson United Bank*, we concluded that the guarantee was assigned to the successor when the original beneficiary merged with the successor, even though the merger documents did not specifically assign the guarantee. *Hudson United Bank* v. *Endeavor Group*, supra, 96 Conn. App. 453. Likewise, in *D'Amato Investments, LLC*, we concluded that the personal guarantee of a lease was assigned to the plaintiff even though the " 'assignment of lease' did not explicitly incorporate or mention the guarantee . . . ." *D'Amato Investments, LLC* v. *Sutton*, supra, 117 Conn. App. 422.