******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ONE COUNTRY, LLC, ET AL. *v.* MICHAEL
JOHNSON ET AL.
(SC 19084)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald and Robinson, Js.

*Argued April 25—officially released October 28, 2014*

*David Eric Ross*, for the appellant (named defendant).

*John B. Farley*, with whom were *Lawrence P. Weisman* and, on the brief, *Eric D. Bernheim*, for the appellee (plaintiff Scott Porter).

*Opinion*

ZARELLA, J. In this action brought by the plaintiff Scott Porter[1] to enforce "backstop" guarantee agreements entered into by the parties for a debt arising from a failed residential renovation project, the named defendant, Michael Johnson,[2] appeals from the judgment of the Appellate Court, which reversed the trial court's judgment in his favor. The defendant specifically challenges the plaintiff's standing to bring this action. The defendant claims that the plaintiff's tax treatment of a debt that the defendant guaranteed effectively divested the plaintiff of his interest in the debt, and, therefore, the plaintiff has no standing to enforce their backstop guarantee agreement. We disagree and, accordingly, affirm the judgment of the Appellate Court.

The following facts, some of which are set forth in the opinion of the Appellate Court, and procedural history are relevant to our disposition of this appeal. "In late 2004, the plaintiff and his then wife, Jennifer Porter,[3] resided at 3 Country Road in [the town of] Westport. At that time, the owners of 1 Country Road were planning to sell their property. The Porters believed that they could make a significant profit if they purchased the adjoining property, enlarged and restored the house, and then sold the property. Because they had no experience in the restoration of properties or investment in real estate, Jennifer Porter approached [the defendant], an acquaintance, who was involved in the restoration of another residential property . . . . [The defendant] introduced the Porters to [Peter] Pratley, who [was a] . . . general contractor . . . .

"The Porters, [the defendant], and Pratley formed a limited liability company, One Country, LLC [One Country] . . . to purchase and to redevelop the 1 Country Road property. . . . [T]he Porters invested $200,000 [in One Country] through their jointly owned limited liability company, Iboport, LLC [Iboport]. [The defendant] and Pratley each invested $50,000." (Footnote altered.) *One Country, LLC* v. *Johnson*, 137 Conn. App. 810, 812–13, 49 A.3d 1030 (2012).

In early 2005, One Country acquired the property at 1 Country Road with the funds invested by its members and a $1,080,000 loan from Connecticut Community Bank, N.A. (bank),[4] which was secured by a mortgage on the property. "As additional security, the plaintiff, as the sole guarantor, unconditionally guaranteed the payment of the acquisition loan by One Country . . . . Because [the defendant] and Pratley already had signed guarantees to the bank in connection with [another real estate] project, the bank was unwilling to rely on their guarantees [for One Country's debt]." Id., 813. One Country also sought from the bank a $1,000,000 loan to finance the construction required to renovate the 1 Country Road property.

"Sometime after the execution of the acquisition loan documents, but before the construction loan closing, the plaintiff forwarded what he termed 'backstop' guarantee agreements to Jennifer Porter, [the defendant], and Pratley. The plaintiff, an attorney employed as . . . in-house counsel [for a corporation], drafted the guarantee [agreements]. [The plaintiff] indicated that he would not sign [a] personal guarantee for the construction loan to One Country . . . unless Jennifer Porter, [the defendant] and Pratley signed guarantees that provided protection to him in the event [that] he was required to honor either of his personal guarantees to the bank.[5] The three backstop [guarantee agreements] were signed before the plaintiff signed his second personal guarantee to the bank at the construction loan closing.

"Despite the bank financing and an additional $200,000 in contributions raised through the admittance of four new members to [One Country], [One Country] exhausted all of its capital in 2007 and was unable to complete the renovations to the property. In 2008, after [One Country] ceased making payments to the bank, the bank commenced foreclosure proceedings against [One Country] and the plaintiff, as guarantor. The court rendered a judgment of strict foreclosure, and the bank then sought a deficiency judgment against the plaintiff. The bank and the plaintiff resolved the matter by entering into a settlement agreement, in which the bank agreed to withdraw its motion for a deficiency judgment upon the plaintiff's payment of $300,000. The plaintiff paid $300,000 to the bank and commenced the present action against [Jennifer Porter, the defendant, and Pratley] to enforce the backstop [guarantee agreements].

"A court trial was held . . . in July, 2010. More than forty exhibits were submitted as evidence, including copies of the plaintiff's personal guarantees to the bank, the backstop [guarantee agreements] signed by [the defendant and Pratley], and the settlement agreement between the plaintiff and the bank. One of the plaintiff's witnesses, Steven Glaser, was a certified public accountant who had prepared tax returns for the plaintiff, [Iboport and One Country] for 2008 and 2009. He testified that the plaintiff made the $300,000 settlement payment to the bank and then he indicated how that payment was treated for tax purposes." (Footnotes altered.) Id., 813–14.

On its 2008 federal income tax return, One Country claimed a $300,000 loss based on the plaintiff's settlement payment to the bank.[6] Iboport, the limited liability company through which the Porters held their interest in One Country, claimed on its 2008 federal income tax return the plaintiff's $300,000 payment as a loss and took a deduction for the loss. The plaintiff also claimed a deduction on his personal income tax return for Iboport's claimed $300,000 loss.[7] On their 2009 federal income tax returns, One Country reported receiving a

$300,000 capital contribution from Iboport, and Iboport reported receiving a $300,000 capital contribution from the plaintiff. In sum, Glaser treated the plaintiff's $300,000 payment to the bank, which satisfied One Country's debt to the bank, as a capital contribution to Iboport so that Iboport and the plaintiff could claim significant deductions on their federal income tax returns. In a memorandum explaining this tax strategy, however, Glaser suggested that, if the plaintiff were to recover any money from the signators to the backstop guarantee agreements, the plaintiff would be required to adjust the tax benefit that he received in 2008 by claiming the $300,000 loss.[8]

The trial court found that the backstop guarantee agreements were supported by consideration and that neither the principle of equitable estoppel nor the principle of promissory estoppel barred the plaintiff from enforcing them. The trial court nonetheless concluded that the backstop guarantee agreements were unenforceable. The court reasoned that the plaintiff had "extinguished" the debt owed to him under the agreements by "convert[ing]" it into an equity investment in Iboport when he treated his $300,000 payment to the bank as a capital contribution to Iboport instead of as an unsatisfied debt owed to him by One Country, thus precluding him from recovering under the agreements. Accordingly, the court rendered judgment for the defendant and Pratley.

Thereafter, the plaintiff appealed to the Appellate Court. In a split decision, the Appellate Court reversed the judgment of the trial court, concluding that the plaintiff was entitled to enforce the backstop guarantee agreements. *One Country, LLC* v. *Johnson*, supra, 137 Conn. App. 818–21. The Appellate Court majority concluded that the agreements unconditionally bound the defendant and Pratley to pay the plaintiff for One Country's debt and that the plaintiff's tax treatment of his $300,000 payment to the bank, made in satisfaction of One Country's debt, was irrelevant to the issue of whether he was entitled to repayment under the terms of the agreements. Id., 818–20. The dissent disagreed on the ground that the plaintiff had assigned to Iboport his interest in the agreements and, therefore, lacked standing to bring a claim enforcing them.[9] Id., 821 (*Schaller, J.*, dissenting). The dissent reasoned that the plaintiff must have "transferred something of value to Iboport, namely, his right to be paid under the personal guarantees"; id., 825–26 (*Schaller, J.*, dissenting); as he claimed to have made a $300,000 capital contribution to Iboport, and General Statutes § 34-150[10] requires investors to provide something of value to a limited liability company in order to gain equity in the company. See id., 825 (*Schaller, J.*, dissenting).

This court subsequently granted the defendant's petition for certification to appeal, limited to the following

question: "Did the Appellate Court properly conclude that the plaintiff . . . was entitled to bring an action to enforce the subject guarant[ee] agreement?" *One Country, LLC* v. *Johnson*, 307 Conn. 944, 60 A.3d 738 (2013). On appeal, the defendant claims that the plaintiff does not have standing to enforce the defendant's backstop guarantee agreement with the plaintiff because, by operation of § 34-150, the plaintiff "effectively" assigned his interest in the agreement to Iboport when Iboport represented on its 2009 federal income tax return that the plaintiff's $300,000 payment to the bank was a capital contribution to Iboport. The plaintiff argues that he has standing and can enforce the agreement because the defendant executed the guarantee agreement in the plaintiff's favor, and the tax treatment of his $300,000 payment to the bank does not affect in any way the plaintiff's rights under the agreement. We agree with the plaintiff.

"It is a basic principle of law that a plaintiff must have standing for the court to have jurisdiction. Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . [W]hen standing is put in issue, the question is whether the person whose standing is challenged is a proper party to request an adjudication of the issue and not whether the controversy is otherwise justiciable, or whether, on the merits, the [party] has a legally protected interest [that may be remedied]." (Citation omitted; internal quotation marks omitted.) *Dow & Condon, Inc.* v. *Brookfield Development Corp.*, 266 Conn. 572, 579, 833 A.2d 908 (2003).

"Standing is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather, it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . These two objectives are ordinarily held to have been met when a complainant makes a colorable claim of direct injury [that] he has suffered or is likely to suffer, in an individual or representative capacity. Such a personal stake in the outcome of the controversy . . . provides the requisite assurance of concrete adverseness and diligent advocacy." (Internal quotation marks omitted.) *Broadnax* v. *New Haven*, 270 Conn. 133, 153, 851 A.2d 1113 (2004).

"Standing requires no more than a colorable claim of injury; a [party] ordinarily establishes . . . standing by allegations of injury. Similarly, standing exists to attempt to vindicate arguably protected interests." (Internal quotation marks omitted.) *May* v. *Coffey*, 291

Conn. 106, 112, 967 A.2d 495 (2009). "[I]t is the burden of the party who seeks the exercise of jurisdiction in his favor . . . clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute. . . . Because a determination regarding the trial court's subject matter jurisdiction raises a question of law, our review is plenary." (Internal quotation marks omitted.) Id., 113. "[I]n determining whether a court has subject matter jurisdiction, every presumption favoring jurisdiction should be indulged." (Internal quotation marks omitted.) *Wilcox* v. *Webster Ins., Inc.*, 294 Conn. 206, 214, 982 A.2d 1053 (2009).

Applying the foregoing principles, we conclude that the plaintiff has alleged facts sufficient to establish his standing to bring this action. The plaintiff alleged, in essence, that the defendant executed the backstop guarantee agreement in the plaintiff's favor, that he was required to pay $300,000 to the bank on behalf of One Country, and that, in turn, the defendant became indebted to him for that amount under the terms of the backstop guarantee agreement. These allegations, which the defendant does not appear to contest, constitute a colorable claim of injury.

Insofar as the defendant claims that the plaintiff lacks standing because he assigned his rights away to enforce the agreement, the defendant does not dispute that his obligation runs to the plaintiff personally rather than to some other entity. The defendant also concedes that there never was a writing memorializing the plaintiff's alleged assignment to Iboport of his rights in the agreement. In fact, the sole piece of evidence on which the trial court relied, and on which the defendant now relies, in determining that the plaintiff assigned his rights away is the tax treatment of the plaintiff's payment of One Country's debt to the bank. This evidence alone, however, is insufficient to cast doubt on the plaintiff's standing.

The law on assignment is well established. "An assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance." 3 Restatement (Second), Contracts § 317 (1), pp. 14–15 (1981). "It is essential to an assignment of a right that the obligee manifest an intention to transfer the right to another person without further action or manifestation of intention by the obligee. The manifestation may be made to the other or to a third person on his behalf and, except as provided by statute or by contract, may be made either orally or by a writing." Id., § 324, p. 37; see also *Dysart Corp.* v. *Seaboard Surety Co.*, 240 Conn. 10, 17, 688 A.2d 306 (1997) (employees did not assign to bar owner their rights under payment bonds by cashing checks at bar because employees did not objectively manifest intent to do

so); *Sunset Gold Realty, LLC* v. *Premier Building & Development, Inc.*, 133 Conn. App. 445, 452–53, 36 A.3d 243 ("[n]o words of art are required to constitute an assignment; any words that fairly indicate an intention to make the assignee owner of a claim are sufficient" [internal quotation marks omitted]), cert. denied, 304 Conn. 912, 40 A.3d 319 (2012). "Generally, to constitute an assignment there must be a purpose to assign or transfer the whole or a part of some particular thing, debt, or chose in action, and the subject matter of the assignment must be described with such particularity as to render it capable of identification." (Internal quotation marks omitted.) *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 211, 227, 828 A.2d 64 (2003). Thus, when the facts are undisputed and the manifestation of intent must be gleaned by examining the words and actions of the alleged assignor, the issue of whether there is a valid assignment is a question of law over which we exercise plenary review. See *Dysart Corp.* v. *Seaboard Surety Co.*, supra, 11, 17. See generally *Gateway Co.* v. *DiNoia*, 232 Conn. 223, 229, 654 A.2d 342 (1995) ("[w]hen . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record" [internal quotation marks omitted]).

We conclude that the plaintiff did not assign to Iboport his interest in the defendant's backstop guarantee agreement, and, therefore, the plaintiff has standing to enforce the agreement. The evidence demonstrates that the plaintiff never made a capital contribution to Iboport because he never transferred to Iboport the $300,000 for the settlement of One Country's debt but, rather, paid the bank directly from his personal funds. In addition, Iboport's 2009 federal income tax return provides merely that the plaintiff contributed $300,000 to Iboport, without specifying in what form, let alone identifying the backstop guarantee agreement as the value contributed. Iboport's federal income tax return contained no express language indicating that the plaintiff intended to transfer to Iboport his interest in the guarantee agreement, and there is no evidence that the plaintiff ever treated the tax return as having such an effect. Although Iboport's declaration of receiving a capital contribution on its income tax return suggests that the plaintiff intended to provide Iboport with something of value, this general representation lacks the specificity and express language or conduct required to objectively establish that the plaintiff intended to assign to Iboport his rights in the guarantee agreement.[11] Accordingly, the fact that the plaintiff claimed a tax deduction for a loss does not preclude him from subsequently seeking to recover from a party indebted to him for that loss. See, e.g., *Bragman* v. *Commonwealth Land Title Ins. Co.*, 421 F. Supp. 99, 103 n.9 (E.D. Pa. 1976) (plaintiff's tax treatment of his payment of tax

lien was irrelevant to defendant's liability for tax lien under title insurance policy), aff'd, 561 F.2d 493 (3d Cir. 1977); *Wichita Federal Savings & Loan Assn.* v. *Black*, 245 Kan. 523, 536–39, 781 P.2d 707 (1989) (rejecting defendant's argument that plaintiff savings and loan association was estopped from recovering more than $17 million that he allegedly lost through negligent financial futures trading because association previously claimed deduction for that loss on income tax return); *H.J. Baker & Bro., Inc.* v. *Orgonics, Inc.*, 554 A.2d 196, 203 (R.I. 1989) (plaintiff's tax deduction for money owed to it by defendant was irrelevant to defendant's abuse of process counterclaim because deduction did not bar plaintiff from seeking to recover debt); see also *Energetics, Inc.* v. *Allied Bank of Texas*, 784 F.2d 1300, 1304 (5th Cir. 1986) (rejecting defendant bank's argument that plaintiff did not own funds offset by defendant because plaintiff previously claimed income tax deduction for those funds); cf. *Del-Chapel Associates* v. *Conectiv*, Delaware Court of Chancery, Docket No. 19498-VCL (Del. Ch. May 5, 2008) (whether plaintiff paid taxes on land on which defendant allegedly trespassed was irrelevant to validity of easements challenged by defendant). We therefore conclude that, because the only evidence of an assignment is the tax treatment of the plaintiff's $300,000 payment to the bank, there is no basis on which to conclude that an assignment occurred.[12]

The defendant's reliance on § 34-150 in arguing that the plaintiff assigned his rights to Iboport is also unavailing. Section 34-150 provides that "[a]n interest in a limited liability company may be issued in exchange for property, services rendered or a promissory note or other obligation to contribute cash or to perform services." The defendant contends that, when the plaintiff declared his $300,000 payment to the bank as a capital contribution, the plaintiff's interest in the backstop guarantee agreement was transferred to Iboport by operation of law under § 34-150. The defendant's reliance on this statutory provision does not further his position. The statute specifies the effect of a transfer of property to a limited liability corporation. The issue before us is whether the tax treatment of a payment on a debt standing alone is sufficient to demonstrate an actual transfer, not what the effect of any transfer might be.

We also reject the defendant's argument that General Statutes § 34-167 is relevant to our resolution of this case. Section 34-167 (a) provides in relevant part that "[p]roperty transferred to or otherwise acquired by a limited liability company is property of the limited liability company and not of the members individually. . . ." Whether the plaintiff retained an interest in the backstop guarantee agreement after allegedly assigning his rights thereunder to Iboport has no bearing on whether the plaintiff made an assignment in the first place.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

[1] The named plaintiff, One Country, LLC, withdrew its claims before trial and is no longer a party to the action. We refer to Scott Porter as the plaintiff throughout this opinion.

[2] This action originally was brought against Johnson, Peter Pratley, Jennifer Porter, and The Pratley Company, LLC. The plaintiff withdrew his claims against Jennifer Porter, with whom he settled out of court, and The Pratley Company, LLC, from whom the plaintiff sought damages under the separate theory of breach of contract for failing to complete the construction project. Pratley did not appeal from the judgment of the Appellate Court, making Johnson the sole appellant. We refer to Johnson as the defendant throughout this opinion.

[3] Hereinafter, we refer to the plaintiff and Jennifer Porter collectively as the Porters.

[4] Connecticut Community Bank, N.A., was doing business as The Greenwich Bank and Trust Company. *One Country, LLC* v. *Johnson*, supra, 137 Conn. App. 813.

[5] The backstop guarantee agreements specifically identify the plaintiff as guaranteeing One Country's acquisition and construction loans in consideration of promises by Jennifer Porter, the defendant, and Pratley to pay One Country's debt to the plaintiff. Furthermore, the agreements provide that the signators guarantee to pay the plaintiff in full "any and all present and future obligations of [One Country] to [the plaintiff] arising from [One Country's loans arrangements with the bank] . . . ." Each agreement also expressly provides that it is a continuing guarantee and is enforceable until One Country's debts to the plaintiff have been paid in full. Under the terms of the agreements, Jennifer Porter, the defendant, and Pratley expressly waived "to the fullest extent permitted by law" any defenses that may limit their liability to the plaintiff under the agreements. Finally, the agreements provide that the signators' obligations to the plaintiff will "not be discharged or otherwise affected by any settlement . . . or . . . payment" of One Country's debt to the plaintiff.

[6] Glaser testified at trial that, alternatively, he could have treated the plaintiff's $300,000 payment to the bank as a liability for One Country and as a note payable to the plaintiff. Glaser explained that he instead treated the payment as a loss, and then subsequently a capital contribution, because he did not believe that the plaintiff, a member of One Country only through his interest in Iboport, had the authority to incur a liability on behalf of One Country.

[7] The precise amount that the plaintiff deducted on his personal income tax return is unclear, as his individual tax returns were never presented at trial. From Glaser's testimony at trial, it appears that the plaintiff claimed the entire $300,000 as a deduction with the intention of adjusting that benefit if Jennifer Porter, the defendant, or Pratley paid him according to the terms of the backstop guarantee agreements.

Glaser testified at trial that he had good reason to believe that the plaintiff was entitled to claim a deduction on his personal income tax return for this transaction. The trial court characterized Glaser's testimony in this regard: "[U]nder the tax code, losses incurred on investments in limited liability companies such as [One Country] are typically treated as capital losses with a limited right to deduct such losses on the investor's personal tax return. However, because of Pratley's position as a person engaged in the construction industry as a member of [One Country], the losses incurred by members of [One Country] were required to be treated as ordinary losses [that] can be deducted, without limit, against ordinary income."

[8] Specifically, Glaser stated in his memorandum: "Please note that if any of the other [m]embers of [One Country] that are sub-guarantors on the loan reimburse Iboport . . . for [his or her] respective share of the loan deficiency the amount will have to be reported by Iboport . . . as income or the payment made by the sub-guarantor will have to be reduced by the tax benefit Iboport . . . received in 2008." Glaser's testimony at trial suggests that, in this portion of the memorandum, he was, in fact, referring to the plaintiff rather than Iboport. This would make sense in light of the fact that Glaser incorrectly suggests in the memorandum that the backstop guarantee agreements were executed in favor of Iboport instead of the plaintiff in his individual capacity. We therefore take Glaser's statements to mean that he believed that both Iboport and the plaintiff would be required to adjust the tax benefits they received in 2008 if they were to be compensated

for the $300,000 loss they claimed.

[9] The Appellate Court majority did not expressly address whether the plaintiff had standing to bring this action.

[10] General Statutes § 34-150 provides: "An interest in a limited liability company may be issued in exchange for property, services rendered or a promissory note or other obligation to contribute cash or to perform services."

[11] Even if the plaintiff's income tax return alone constituted an objective manifestation of an intention to assign to Iboport certain rights in the guarantee agreement, the defendant did not establish that it was a *total* assignment. Indeed, Glaser, the plaintiff's accountant, suggested in his memorandum, which was introduced into evidence at trial, as well as in his trial testimony that, if the plaintiff recovered under the backstop guarantee agreement, he would have been required to adjust the tax benefit that he received when he claimed a loss for the $300,000 settlement payment. This would suggest that the plaintiff retained control over his rights to collect on the debt. See, e.g., *Bragman* v. *Commonwealth Land Title Ins. Co.*, 421 F. Supp. 99, 103 n.9 (E.D. Pa. 1976), aff'd, 561 F.2d 493 (3d Cir. 1977).

[12] The defendant also claims that allowing the plaintiff to enforce the backstop guarantee agreement would create an undeserved windfall for the plaintiff, as he would recoup his $300,000 payment and still enjoy the tax benefit he claimed when he reported that payment as a capital contribution to Iboport. This argument, however, is unavailing because it is unrelated to the issue of standing.